PRESENT: All the Justices

THOMAS HUNT ROBERTS

v. Record No. 180122

OPINION BY
JUSTICE D. ARTHUR KELSEY
SEPTEMBER 6, 2018

VIRGINIA STATE BAR

FROM THE VIRGINIA STATE BAR DISCIPLINARY BOARD

Thomas Hunt Roberts appeals a decision of the Virginia State Bar Disciplinary Board

(the "Board") sanctioning him with a public reprimand with terms after finding that he violated

Rules 1.15(a)(3)(ii) and 1.15(b)(5) of the Virginia Rules of Professional Conduct ("Disciplinary

Rules"). Finding no error in the Board's decision, we affirm.

I.

On appeal, "we view the evidence and all reasonable inferences that may be drawn

therefrom in the light most favorable to the Bar, the prevailing party below." *Green v. Virginia

State Bar, ex rel. Seventh Dist. Comm.*, 274 Va. 775, 783 (2007).

A. THE REPRESENTATION AGREEMENT

In December 2014, Lauren Hayes engaged Thomas H. Roberts & Associates, P.C., to

represent her regarding a personal injury claim arising out of a vehicle collision. On behalf of

the firm, Roberts entered into a Representation Agreement, *see* 2 J.A. at 332-37, which, among

other things, provided that the firm would receive a contingency fee of "33 1/3 percent of the

gross . . . of any and all judgment and/or recovery, computed before any deductions, including

but not limited to expenses or costs," *id.* at 332.

The agreement stated that the contingency fee would increase to 40% "[i]f the recovery is

within 45 days of the first trial date or thereafter." *Id.* It also provided that "any settlement or

award" that included attorney fees "shall be paid to the law firm in addition to the contingency

fees provided for above." *Id.* In addition to the stipulated fees, the agreement required Hayes to pay "all costs and expenses" of the firm, including charges for word processing, computerized research, travel, copying, court reporters, and other similar expenditures. *Id.* at 333.

Another provision of the agreement required Hayes "to maintain a balance of $150.00 in trust with the law firm" and stipulated that "[t]his money held in trust belongs to the client." *Id.* (emphasis omitted). The firm reserved the right, however, to "draw against the money held in trust for costs and expenses and also for payment of fees for services performed" and similarly advised that "[a]t such time as the law firm ceases to represent the client, any amount remaining in trust will be returned to the client, after deduction for costs & expenses and fees for service." *Id.*

In the event that Hayes terminated the representation, the agreement instructed her that "any such termination shall not in any way affect the client's obligation to pay" for all bills that the firm had incurred as well as "interest, costs and attorney's fees on the terms and conditions set forth in this Agreement." *Id.* at 334-35. In bold print, the agreement added:

> Additionally, client understands and agrees that if the client terminates the representation where all or part of the firm[']s fee for services was to be computed based on some contingency, the law firm will be entitled to a fee quantum merit [sic] for services rendered. Client agrees that the reasonable value of the services rendered to it by the law firm shall not be less than the fees set forth in this Agreement.

*Id.* at 335 (emphasis omitted). Finally, the agreement permitted an additional minimum charge of "25% of the amount owing" if the firm had to engage in collection efforts against Hayes. *Id.*

### B. THE TERMINATION

Hayes eventually became dissatisfied with the firm's handling of her claim. In August 2015, she notified the firm that she was terminating the representation. *See id.* at 375. She

2

understood "that any cost[s] incurred or expenses paid" by the firm would be "deducted" from the balance in the trust account. *Id.* She added: "It is also my understanding that if there is a remaining balance from the money held in trust after all expenses are paid that the remaining balance will be returned to me." *Id.*

An associate with the firm replied via letter titled Notice of Attorneys' Lien to advise Hayes that she could "collect [her] file and the balance of [her] trust account" anytime during the following week and that she had "a trust balance of $150.00 with th[e] firm." *Id.* at 377. The associate's letter also informed Hayes that, pursuant to the Representation Agreement, the firm was "entitled to a fee quantum meruit for services rendered, and that the reasonable value of the services rendered by th[e] firm shall not be less than the fees set forth in th[e] Agreement." *Id.* The letter added: "The firm has expended $5,532.00 of its time representing you." *Id.*

Hayes wrote back requesting "a breakdown of the $5,532.00 lien" and stating that she intended "to dispute the amount of the lien." *Id.* at 378. Writing an email in reply, Roberts quoted to her the quantum meruit provision of the agreement and restated the firm's assertion of a lien. *See id.* at 379-80. The email also warned Hayes that "should the firm be required to undertake efforts to collect its fees in this matter that it will be entitled to recover an additional 25%." *Id.* at 380. The email included a ledger showing a balance of $150 in the trust account.

In October 2015, Hayes advised Roberts's firm by letter that she had retained another attorney, Mark Esposito, and directed that her file be forwarded to him. She also asked that the firm send her a check for the balance in the trust account. *See id.* at 382.[1] Roberts did not directly respond to this letter. Instead, the firm transferred $6.70 from the trust account into its

[1] Roberts concedes in his brief on appeal that Hayes "asked for the balance of the funds" and "that she understood the money was to be repaid to her." Appellant's Br. at 23.

operating account to cover the cost of mailing the file to Esposito, leaving a balance of $143.30. *See id.* at 373. The associate attorney also made a new time entry in the ledger noting that he had received Hayes's demand for a return of her trust funds and was sending a check to her.[2] *See id.* at 371. Hayes never received any refund, however. Roberts then wrote Esposito and advised him that the firm asserted a lien of $5,744.50[3] in the case and that "[t]he last offer we received from the insurance company was $7,800." *Id.* at 383 (emphasis omitted).

When it became clear that there would be no resolution of the lien issue, Esposito filed a suit against Roberts's firm on Hayes's behalf in general district court. The warrant in debt inexplicably claimed that Roberts's firm "owe[d] [Hayes] a debt in the sum of" $5,744.50. *Id.* at 386. A bill of particulars, however, later stated that the warrant in debt was meant to seek a declaratory judgment declaring the asserted lien to be unreasonable and setting forth the reasonable value of Roberts's services. Roberts's firm responded with a motion to dismiss, a motion to strike, grounds of defense, and a motion for sanctions. On June 2, 2016, the general district court dismissed the warrant in debt for lack of jurisdiction and denied the motion for sanctions. *See id.* at 403.[4]

---

[2] At the disciplinary hearing, the associate testified that this time entry was only a "to-do notation" for the task of sending the check to Hayes. 1 J.A. at 115-16.

[3] The original lien demand in August 2015 claimed $5,532 and declared that "THE REPRESENTATION HAS ENDED." 2 *id.* at 377 (emphasis omitted). This subsequent lien demand in November 2015 for $5,744.50 appears to be based on a claim for legal fees incurred after the firm had declared that its representation had ended. *See* 1 *id.* at 117; 2 *id.* at 371. The difference of $212.50 appears to stem from time billed for communicating with Hayes and Esposito after the termination. *See* 2 *id.* at 371.

[4] Esposito had withdrawn his representation and nonsuited the personal injury suit a few weeks before this order dismissing the case against the firm. *See id.* at 412. Hayes refiled the personal injury suit pro se in general district court. It remained pending throughout the proceedings below. *See* 1 *id.* at 70-72.

In April 2016, Roberts transferred $143.30, the remaining balance in the trust account, to his firm's operating account, claiming that it was a partial payment for his firm's fees. The firm did not notify Hayes of this transfer. At that time, Hayes had received no settlement, judgment, or recovery of any kind on her personal injury claim. A notation on the ledger stated: "Paid to Thomas H. Roberts & Associates, P.C. Applied to Quantum Meruit - Fees Earned $143.30." *Id.* at 373. The ledger showed a trust balance of $0 and a balance due to the firm of $5,783.70, which appears to represent an amount including additional charges for travel to the post office and communication with Esposito but with a credit for the $143.30 that Roberts had transferred. *See id.* at 371-74.

## C. THE BAR'S INVESTIGATION

In June 2016, Hayes executed a "Lawyer Inquiry Form" complaining that Roberts's firm had asserted a "ridiculous" lien, failed to return her trust funds, and failed to handle her claim expeditiously. *See id.* at 404-07. The Bar received the complaint and began an investigation. During the investigation, the Bar provided Hayes with the ledger that showed the transfer of the $143.30 from the firm's trust account to its operating account. *See* 1 *id.* at 69-70; 2 *id.* at 373. Hayes had only seen an earlier version of this ledger, displayed in a different format, that did not include any notation of the transfer.

Also during the investigation, Hayes provided the Bar with an annotated copy of the earlier ledger (provided by the firm to Hayes in September 2015) on which she had noted her disputes over certain charges and made a notation of "OK" next to four of the charges. *See* 2 *id.* at 323-30. At the disciplinary hearing, Hayes conceded that the charges marked "OK" totaled approximately $500, but she clarified that while she was "[a]greeing that there was work that had been done," there was "plenty" on the ledger with which she was disagreeing. 1 *id.* at 96-97.

5

She testified that at no point did she resolve her dispute with Roberts over his fees or give him permission to take any money out of the trust account for his fees. *See id.* at 72-73.

The Bar charged Roberts with violating Disciplinary Rules 1.5(a) (Fees), 1.15(a)(3)(ii) (Safekeeping Property), 1.15(b)(4) & (5) (Safekeeping Property), 1.16(d) (Declining or Terminating Representation), and 8.4(a) (Misconduct). After a hearing, the Third District Committee found that Roberts had only violated Disciplinary Rules 1.15(a)(3)(ii) and 1.15(b)(5). *See* 2 J.A. at 482-83. The Committee imposed a public reprimand with terms, requiring Roberts to place the $143.30 back in trust until a tribunal determined the disposition of the funds or until Hayes and Roberts reached an agreement regarding such disposition, and also required Roberts to take 8 hours of Continuing Legal Education classes in ethics. *See id.* at 483.

The Committee "declined" to make a "finding" under a clear and convincing evidence standard that Roberts had violated Disciplinary Rule 1.5 and other Disciplinary Rules by transferring the $143.30 before Hayes had received any recovery. 2 J.A. at 482, 489. Instead, the Committee found that Roberts had violated Disciplinary Rule 1.15(a)(3)(ii) when he transferred the funds knowing that there was an ongoing dispute regarding his fees and that Hayes had demanded a refund of the money in trust. *See* 2 J.A. at 489-90. The Committee also found that Roberts had violated Disciplinary Rule 1.15(b)(5) when he transferred the funds without Hayes's consent or the direction of a tribunal. *See* 2 J.A. at 490.

On appeal to the Disciplinary Board, Roberts argued that these two violations should be overturned because: (1) Hayes had consented to the transfer in the Representation Agreement, which provided for the transfer of money from the trust account to the firm for its fees upon a termination of the contingency agreement; (2) there was no genuine dispute over the firm's right to at least $143.30; and (3) Roberts had provided the accounting and severance of interests that

Rule 1.15(a)(3)(ii) requires. He also claimed that the District Committee's interpretation of Disciplinary Rule 1.15(b)(5) was unexpected, thereby violating his due process rights, and that Disciplinary Rule 1.15(a)(3)(ii) is unconstitutionally vague.

The Bar's brief to the Disciplinary Board made several references to the fact that Roberts had transferred the funds before Hayes received any recovery on her personal injury claim. The brief argued that if the Representation Agreement allowed Roberts to recover in quantum meruit before Hayes had received any recovery, the agreement "was improper from the beginning." 2 J.A. at 552. In response, Roberts filed a motion to strike portions of the Bar's brief, arguing that the Disciplinary Board had no jurisdiction to hear these arguments because the District Committee had specifically declined to find any violation based on the fact that Roberts had transferred the funds before Hayes obtained any recovery. He also claimed that the Bar's arguments violated his due process rights.

The Disciplinary Board denied the motion, finding it "pointless" to strike portions of the brief since "we've all read it." *Id.* at 613. The Disciplinary Board stated, however, that "all we're considering here . . . [are] the violations of the two rules which survived." *Id.* On those two violations, the Disciplinary Board affirmed the findings of the District Committee and the sanction that the Committee had imposed.

## II.

In reviewing an appeal from Bar disciplinary proceedings, we "make an independent examination of the whole record, giving the factual findings [of the Disciplinary Board] substantial weight and viewing them as prima facie correct." *Green*, 274 Va. at 783 (alteration and citation omitted). These findings are "not given the weight of a jury verdict" but "will be sustained unless it appears they are not justified by a reasonable view of the evidence or are

7

contrary to law." *Id.* The interpretation of the Disciplinary Rules, however, is a question of law that we review de novo. *Zaug v. Virginia State Bar, ex rel. Fifth Dist. - Section III Comm.*, 285 Va. 457, 462 (2013).

### A. THE DISPUTE OVER THE TRUST FUNDS

Roberts claims that he did not violate the Disciplinary Rules by withdrawing $143.30 from the trust account.[5] As he sees it, the Representation Agreement allowed him, in the event that Hayes terminated the representation, to convert his contingency fee into a quantum meruit fee measured by billable hours. Under this view, the quantum meruit fee was liberated from any contingencies and accrued immediately upon termination, making it due and owing even if Hayes never recovered anything either by means of a settlement or a judgment. Relying on this premise, Roberts asserted below, "There is no doubt that this law firm's quantum meruit fees exceeded $143.30 — the balance of the trust after expenses which was applied to *fees earned* on April 14, 2016." 2 J.A. at 446 (emphasis added).

From Roberts's perspective, the Bar errs in that "it does not care about the objective merits of the dispute." Appellant's Br. at 24. Roberts argues that he transferred the funds "consistent with the representation agreement" and points out that the Bar itself "stipulated" to the "substantial work" that the firm had performed for Hayes and "declined to argue" that his services "were not worth $143.30." *Id.* at 24-25. He notes that Hayes also "acknowledged . . . that the firm did substantial work" and that she was "OK" with fees that totaled more than $500. *Id.* at 25. According to Roberts, the merits of the dispute do matter, and he was entitled to make his own determination of those merits according to his interpretation of the facts and the

---

[5] Roberts asserts nine assignments of error. Our discussion in Part II.A. corresponds roughly to Assignments of Error 2, 3, 4, and 7.

8

Representation Agreement,[6] which in his view provided for the transfer of the trust funds to satisfy his quantum meruit fees without any previous recovery and without allowing Hayes to withdraw her consent.

Roberts adds that there was no dispute as to the $143.30 in trust because Hayes's bill of particulars in the general district court only challenged the reasonableness of the lien and because the ledger which Hayes marked up included several notations stating that she was "OK" with certain charges that added up to more than $143.30. *See id.* at 30-32. Nor was there any reason, Roberts argues, for someone other than himself to conduct "an accounting and severance of their interests," Va. Sup. Ct. R., Part 6, § II, ¶ 1.15(a)(3)(ii). Instead, Roberts claims that he could simply determine whether or not Hayes disputed his entitlement to the $143.30 in trust.[7]

---

[6] *See* Appellant's Br. at 22 ("It reasonably appeared Ms. Hayes's claims no longer impugned the money in trust . . . . In evaluating the situation in April 2016, after responding to th[e] bill of particulars, Mr. Roberts transferred the money out of trust."); *id.* at 28 ("[T]he only issue that needed to be resolved for Mr. Roberts to transfer the money . . . was this: *Were two parties presently claiming an interest in the money in trust*? In April 2016 the answer was (or reasonably appeared to be) '*No.*'" (emphases in original); *id.* at 32 ("[The bill of particulars] provided Mr. Roberts a basis for reasonably believing [Hayes] no longer claimed an interest in the money in trust . . . thereby resolving that dispute. Moreover, . . . Ms. Hayes *did not, in fact, honestly dispute the firm's right to $143.30. . . .* [S]he recognized the work performed by the firm. She freely and voluntarily circled the monetary amounts listed for four entries of the ledger and annotated them as 'OK' . . . ." (emphasis in original) (footnote omitted)).

[7] *See id.* at 17-18 (stating that Disciplinary Rule 1.15(a)(3)(ii) leaves attorneys to "speculate" as to who determines the existence of a dispute or whether a dispute has been resolved as well as who performs the required accounting and severance, but concluding that "[n]othing in this Rule, however, prohibits Mr. Roberts from deciding the dispute was resolved . . . ."); *see also* Reply Br. at 1-2 ("The Bar concedes the attorney managing the trust fund must perform the Rule 1.15(a)(3)(ii) accounting and severance. . . . This Rule operates on the premise that an attorney can and must determine the 'question of fact' as to whether there are or there are not competing claims to funds. . . . The Rule requires attorneys to determine if there are competing claims." (emphases omitted) (citing Appellee's Br. at 13)); Oral Argument Audio at 25:41 to 27:01 (arguing that Roberts had a "duty to determine" whether there was a dispute); *supra* note 6.

We disagree with the first premise of Roberts's argument — that an attorney claiming an interest in trust funds can unilaterally determine whether a dispute over the funds exists or has been resolved. Disciplinary Rule 1.15(a)(3)(ii) forbids a lawyer from taking funds out of a client trust account whenever "two or more persons (one of whom may be the lawyer) claim an interest" in the trust account. If such a dispute arises, the funds "shall be held in the trust account until the dispute is resolved and there is an accounting and severance of their interests. Any portion finally determined to belong to the lawyer or law firm shall be promptly withdrawn from the trust account." Va. Sup. Ct. R., Part 6, § II, ¶ 1.15(a)(3)(ii). Nothing in the text or context of this Disciplinary Rule suggests that an attorney, while claiming an interest in the trust funds, gets the last word on whether a dispute exists and, if so, whether it has been resolved in his favor.

That said, we agree that Disciplinary Rule 1.15(a)(3)(ii) presupposes that there must be a good faith basis for the claimant's dispute. However, we find that such a good faith basis exists for Hayes's dispute in this case. Hayes hired Roberts's firm to assert a personal injury claim. The Representation Agreement authorized a percentage fee contingent upon Hayes recovering compensation by settlement or judgment. The "quantum mer[u]it" clause authorized a fee if Hayes terminated the representation and stipulated that the fee would be based upon the "reasonable value" of the firm's services, which "reasonable value" would "not be less than the fees set forth in th[e] Agreement." 2 J.A. at 335. It would be reasonable for an injured claimant to assume that, whatever amount a "quantum mer[u]it" fee might be, it nevertheless would be, like "the fees set forth in th[e] Agreement," *id.*, contingent upon her recovering on her claim.[8]

---

[8] Roberts devotes three assignments of error (7, 8, and 9) to his assertion that the Disciplinary Board improperly permitted the Bar to re-allege that Roberts had violated the Disciplinary Rules by withdrawing the money from the trust account before Hayes obtained any recovery on her claim because the District Committee declined to find a violation based on that

Hayes twice demanded a *full* return of any funds remaining in the trust account after the deduction of costs and expenses. *See id.* at 375, 382. Roberts concedes as much on brief, acknowledging that Hayes "asked for the balance of the funds" and "that she understood the money was to be repaid to her." Appellant's Br. at 23. Hayes testified that at no time did she agree that Roberts "was entitled to fees," nor did she ever consent to him deducting any fees from the trust account except for costs and expenses. 1 J.A. at 69; *see* 2 *id.* at 375. She did not remember specifically discussing the "quantum mer[u]it" provision, 2 *id.* at 335, in the Representation Agreement with Roberts. *See* 1 *id.* at 57. Nor did anything in the agreement make clear to Hayes that a quantum meruit fee was not conditioned upon whether and when she received any recovery.

Quantum meruit is Latin for "as much as he has deserved." Black's Law Dictionary 1437 (10th ed. 2014). Absent a termination of the attorney-client relationship, the Representation Agreement stipulated that Roberts contractually *deserved* a fee only if Hayes ultimately recovered. It would be reasonable for Hayes to assume that the same contingency (an ultimate recovery) would apply to the quantum meruit fee in the event that she terminated the relationship. After all, in dicta, we have observed that the calculation of a quantum meruit fee

theory. *See* Appellant's Br. at 2. However, we do not address the question whether a quantum meruit fee would be contingent upon Hayes's recovery in order to resurrect a theory of discipline that the District Committee did not adopt and that the Disciplinary Board did not address on appeal. Rather, we address this issue solely for the purpose of determining whether, under these unusual facts, Hayes could have asserted a dispute over the trust funds in good faith.

Moreover, by declining to find a violation on this theory by clear and convincing evidence, the District Committee did not affirmatively rule that Roberts had a right to withdraw the funds before a recovery. Thus, while we will not resurrect this theory of discipline to find a separate violation against Roberts, we do address the point insofar as it relates to the violations actually found, in particular to the finding that Roberts withdrew the funds from the trust account in the face of a good faith dispute as to his entitlement to them.

11

should take into account not only "[t]he amount and character of the services rendered" but also "whether or not the fee is absolute or contingent." *Hughes v. Cole*, 251 Va. 3, 25 (1996) (quoting *County of Campbell v. Howard*, 133 Va. 19, 51 (1922)).

According to Roberts, a footnote in *Heinzman v. Fine, Fine, Legum & Fine, Attorneys at Law*, 217 Va. 958 (1977), "suggests" that a quantum meruit fee can never be "contingent on the client's recovery." Appellant's Br. at 8 n.4. The *Heinzman* footnote reads in pertinent part, "As applied in this context, a quantum meruit determination looks to 'the reasonable value of the services rendered, not in benefit to the client, but, in themselves.'" 217 Va. at 964 n.4 (quoting *Howard*, 133 Va. at 51). However, that footnote, and the text of *Howard* upon which it relies, must be understood in context. While *Heinzman* and *Howard* distinguish between a measure of compensation based upon a benefit to the client and a measure of compensation based upon the reasonable value of the services rendered, *Howard* specifically includes the concept of a benefit to the client within its discussion of the factors that courts should consider in determining the reasonable value of an attorney's services.

In *Howard*, we stated that when determining the reasonable value of an attorney's services, courts should consider, among other factors, "whether or not the fee is absolute or contingent, it being a recognized rule that an attorney may properly charge a much larger fee where it is to be contingent than where it is not so." 133 Va. at 51. The reason why is because the contingency-fee lawyer takes a risk that he will receive no compensation for his services. *See, e.g.*, *Commonwealth v. Huynh*, 262 Va. 165, 172-73 (2001). That the factors for determining the reasonable value of an attorney's services include whether the fee is contingent (in which case a higher fee may be reasonable depending on the risk-reward ratio) demonstrates that *Howard*, and therefore *Heinzman*, include the concept of a benefit to the client *within* the

12

calculation of a quantum meruit fee even while recognizing the distinction *between* a quantum meruit fee and one based on the benefit to the client.

In *Heinzman*, a claimant seeking property and personal injury damages arising out of a vehicle collision hired an attorney and signed a written agreement to pay him a one-third contingency fee on any recovery. The attorney settled the property damage claim and received his contractual fee of one-third of that amount. The client thereafter fired the attorney "entirely without just cause," *Heinzman*, 217 Va. at 962 n.3, and hired another attorney to pursue the personal injury claim. The second attorney settled the personal injury claim one day before trial and the first attorney requested, pursuant to the client's previous agreement with him, a one-third contingency fee on that settlement amount. The trial court approved the settlement and awarded the first attorney his contractual fee of one-third of the settlement that the second attorney had obtained.

On appeal, we reversed the order approving the first attorney's fee. Our holding, however, was quite specific:

> Having in mind the *special nature of a contract for legal services*, we hold that when, as here, an attorney employed under a *contingent fee contract* is discharged *without just cause* and the client employs another attorney *who effects a recovery*, the discharged attorney is entitled to a fee based upon quantum meruit for services rendered prior to discharge and, as security for such fee, to the lien granted by Code § 54-70 [current Code § 54.1-3932].

*Heinzman*, 217 Va. at 964 (emphases added) (footnote omitted).[9]

---

[9] In this context, an attorney cannot recover a quantum meruit fee unless he "is discharged without just cause." *Heinzman*, 217 Va. at 964. In our review of this case, we assume arguendo, but do not decide, that Hayes fired Roberts without just cause.

13

"[T]he special nature of a contract for legal services" led us to reject the view "that a contract for legal services is the same as any other contract and is governed by the same rules concerning breach and the measure of damages." *Id.* at 962. A different paradigm governs the relationship between a Virginia attorney and a layman client:

> Contracts for legal services are not the same as other contracts.
>
> "It is a misconception to attempt to force an agreement between an attorney and his client into the conventional modes of commercial contracts. While such a contract may have similar attributes, the agreement is, essentially, in a classification peculiar to itself. Such an agreement is permeated with the paramount relationship of attorney and client which necessarily affects the rights and duties of each."
>
> Seldom does a client stand on an equal footing with an attorney in the bargaining process. Necessarily, the layman must rely upon the knowledge, experience, skill, and good faith of the professional. Only the attorney can make an informed judgment as to the merit of the client's legal rights and obligations, the prospects of success or failure, and the value of the time and talent which he must invest in the undertaking. Once fairly negotiated, the contract creates a relationship unique in the law.

*Id.* at 962-63 (alteration and citation omitted).

Against this backdrop, *Heinzman* addressed the scenario in which the discharged attorney was "employed under a contingent fee contract" and sought an award of fees *after* the second attorney had "effect[ed] a recovery" on behalf of the client. *Id.* at 964. Under these facts, we held that the first attorney could recover "a fee based upon quantum meruit for services rendered prior to discharge." *Id.* (footnote omitted).

We did not hold in *Heinzman* that, nor have we ever addressed whether, a discharged contingency-fee attorney can recover in quantum meruit from a personal injury claimant who never receives any compensation whatsoever. Even if quantum meruit principles theoretically permitted such a fee, the fee would still have to be adequately explained to the client, be

14

reasonable under all the circumstances, and not unreasonably hamper the client's right to discharge counsel. *See* Va. Sup. Ct. R., Part 6, § II, ¶¶ 1.4, 1.5(a)-(c), 1.16(a)(3); Va. Legal Ethics Op. 1812, 2005 Va. Legal Ethics Ops. LEXIS 4, at *6-7 (Oct. 31, 2005). Whatever the contours of such a provision, it must not function as a poison pill that financially punishes a client for, and thus deters a client from, exercising her right to end the attorney-client relationship.

Roberts also relies on Legal Ethics Opinion 1812 as support for the quantum meruit provision in the Representation Agreement. In that opinion, the Virginia State Bar Standing Committee on Legal Ethics ("Legal Ethics Committee") addressed a contingency-fee agreement that included an "alternative fee arrangement" provision that required the client, in the event that he terminated the representation, to pay either an hourly fee for all pre-termination legal work or to pay, at the attorney's election, the agreed contingency fee applied to "any settlement offer made to Client prior to termination." Va. Legal Ethics Op. 1812, 2005 Va. Legal Ethics Ops. LEXIS 4, at *1, *11. The Committee concluded that the hourly-fee provision was "unclear" as to whether it was attempting to create an alternative hourly fee or to establish an agreed-upon hourly rate in a quantum meruit analysis, and that, if the latter were true, it went "too far" by appearing "to attempt to set an hourly rate for quantum meruit analysis, which is misleading and, therefore, impermissible." *Id.* at *9-11.

The Committee also found fault with the provision allowing the attorney to elect compensation based upon the agreed contingency fee applied to any settlement offer made to the client prior to termination. That provision, the Committee opined, was "likewise improper as it is misleading and fails to fully and properly inform the client of the lawyer's entitlement to

15

compensation in the event the client terminates the representation prior to a recovery from the defendant." *Id.* at \*11-12.

Rather than support Roberts's position, Legal Ethics Opinion 1812 undermines it. His Representation Agreement did not explain to Hayes that she would be liable for quantum meruit fees irrespective of when, and even if, she obtained compensation from the alleged tortfeasor. In addition, much like the hourly-rate provision rejected by the Legal Ethics Committee, the provision at issue here attempted to set the "fee quantum mer[u]it for services rendered" in advance, but set that fee at an amount *no less* "than the fees set forth in th[e] Agreement." 2 J.A. at 335. Both the 33.3% and 40% fee calculations in the agreement presupposed a compensatory recovery by Hayes. In the event that she terminated the representation and thus recovered nothing, the provision would mean only that the quantum meruit fee would be no less than zero.

This case does not require us to interpret with finality the disputed fee provisions in the Representation Agreement or to rule on their legal or ethical validity. The only question we ask is whether Roberts violated Disciplinary Rule 1.15(a)(3)(ii) by unilaterally transferring $143.30 from the trust fund to his firm's operating account in partial payment of his fees. We agree with the Board that he did. At the time that Roberts transferred the trust funds, Hayes disputed his entitlement to the balance of the funds and did so in good faith.

### B. DISCIPLINARY RULE 1.15 & THE CONSTITUTION

Roberts also argues that the Disciplinary Board's findings violated his due process rights because Disciplinary Rules 1.15(a)(3)(ii) and 1.15(b)(5) are unconstitutionally vague and were arbitrarily enforced. *See* Appellant's Br. at 12-26, 33-40.[10] We disagree.

---

[10] This discussion corresponds roughly to Assignments of Error 1 and 5. Aspects of Assignment of Error 5 are also addressed in Part II.C.

16

1.

A Disciplinary Rule "is presumed to be constitutional, and we will resolve any doubt regarding its constitutionality in favor of its validity." *Motley v. Virginia State Bar*, 260 Va. 243, 247 (2000). Beginning our analysis with this presumption, we must first determine the proper scope of Roberts's void-for-vagueness argument. When a party makes a vagueness challenge, he generally cannot argue vagaries in aspects of the challenged law that do not directly affect him — a legal claim often called a "facial challenge." *See, e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-20 (2010); *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-95 & n.7 (1982); *Parker v. Levy*, 417 U.S. 733, 755-56 (1974); *Shin v. Commonwealth*, 294 Va. 517, 526-27 (2017); *Toghill v. Commonwealth*, 289 Va. 220, 227-28 (2015); *Commonwealth v. Hicks*, 267 Va. 573, 580-81 (2004).

Instead, Roberts can challenge only those irresolvable ambiguities that caused his alleged unconstitutional deprivation. *See Motley*, 260 Va. at 247 (applying an "as-applied" standard in which the challenged statute or rule is "examined in light of the facts of the case at hand" (citation omitted)). The only recognized exception to this general rule involves vagueness challenges to laws that allegedly violate First Amendment rights. *See Holder*, 561 U.S. at 18-20; *Parker*, 417 U.S. at 752; *Volkswagen of Am., Inc. v. Smit*, 279 Va. 327, 336 (2010); *Motley*, 260 Va. at 247. Because Roberts's arguments do not implicate any First Amendment rights, we address only those vagaries that he identifies in Disciplinary Rule 1.15 that are directly relevant to his public censure by the Disciplinary Board.

The void-for-vagueness doctrine, implicit in constitutional due process principles, also takes into account the gravity of the harm resulting from the alleged unconstitutional deprivation. Thus, courts generally afford a "greater tolerance of enactments with civil rather than criminal

17

penalties because the consequences of imprecision are qualitatively less severe." *Sessions v.*
*Dimaya*, 584 U.S. ___, ___, 138 S. Ct. 1204, 1212-13 (2018) (plurality opinion) (quoting *Village*
*of Hoffman Estates*, 455 U.S. at 498-99).[11] It is relevant, therefore, that Roberts did not receive a
criminal punishment. Nor did the Bar revoke or even temporarily suspend his license. He only
received a public censure. That rebuke, as impactful as it might be on his reputation, does not
change the fact that a "proceeding to discipline an attorney is a civil proceeding." *Moseley v.*
*Virginia State Bar, ex rel. Seventh Dist. Comm.*, 280 Va. 1, 3 (2010) (per curiam) (citing *Norfolk*
*& Portsmouth Bar Ass'n v. Drewry*, 161 Va. 833, 837 (1934)). "The primary purpose of such
disciplinary proceedings is to protect the public, not punish the attorney." *Id.* (citing *Seventh*
*Dist. Comm. of the Va. State Bar v. Gunter*, 212 Va. 278, 284 (1971)).

2.

Working within these parameters, we address Roberts's main void-for-vagueness
argument. Specifically, Roberts contends that Disciplinary Rule 1.15(a)(3)(ii) is
unconstitutionally vague because it lacks "an express scienter requirement," uses the "passive
voice," includes "undefined terms," and "equivocat[es] in its terms." Appellant's Br. at 14. He
also maintains that this Rule is irreparably vague because it appears to enable a "damned-if-you-
do, damned-if-you-don't approach." *Id.* at 16. Under this view, "the Bar can discipline an
attorney retrospectively at any point either for leaving money in trust or for taking the money out

---

[11] While recognizing the general rule that courts allow greater latitude in the civil context,
the plurality of the Court in *Sessions* found the heightened standard of the criminal context
applicable to immigration removal laws because "deportation is 'a particularly severe penalty,'
which may be of greater concern to a convicted alien than 'any potential jail sentence.'" 584
U.S. at ___, 138 S. Ct. at 1213 (citation omitted). Because "federal immigration law
increasingly hinge[s] deportation orders on prior convictions, removal proceedings [have
become] ever more 'intimately related to the criminal process.'" *Id.* (citation omitted).

of trust, merely by contradicting (months after the fact) the attorney's evaluation as to which provision of the Rule should apply." *Id.* We disagree.

Disciplinary Rule 1.15(a)(3)(ii) cannot reasonably be read to allow the Bar to punish an attorney for taking money out of a trust account and, alternatively, to punish him for leaving the same money in the trust account. The Rule prohibits removing funds subject to a "dispute" and requires the prompt transfer of all or part of those funds to the attorney's account after the funds have been "finally determined" to belong to the attorney. Va. Sup. Ct. R., Part 6, § II, ¶ 1.15(a)(3)(ii); *see also id.* cmt. [3] ("The undisputed portion of the funds shall be promptly distributed."). Neither the text nor the ethical context of this Disciplinary Rule places an attorney in the lose-lose scenario that Roberts hypothesizes.

Roberts next argues that "[t]he terminology of this Rule is also vague because the Rule uses material terms and phrases that are undefined . . . — most notably the key terms 'accounting' and 'severance of their interests.'" Appellant's Br. at 18. The absence of an explicit definition of these terms, he concludes, "allows the Bar to use, after the fact, whatever standards it wants." *Id.* Another ambiguity that Roberts sees in these terms is the Disciplinary Rule's use of the passive voice when employing them, which suggests to him that he alone can perform the required "accounting" and "severance" and, based upon them, can unilaterally determine whether he may withdraw funds from the trust account. *See id.* at 17-18; *supra* note 7. We cannot accept that view as a plausible interpretation of these terms in the context of our Disciplinary Rules.

Courts have often said that "[i]n legal codes, as in ordinary conversation, 'a word is known by the company it keeps.'" *Tvardek v. Powhatan Vill. Homeowners Ass'n*, 291 Va. 269, 278 (2016) (citation omitted). A void-for-vagueness challenge cannot prevail by isolating a

specific term and arguing that it is abstractly ambiguous. *See, e.g.*, *United States v. Williams*, 553 U.S. 285, 306 (2008) (acknowledging the invalidity of criminal statutes creating "wholly subjective judgments without statutory definitions, *narrowing context, or settled legal meanings*" but finding "no such indeterminacy" in the statute at issue (emphasis added)); *Gray v. Commonwealth*, 260 Va. 675, 680-81 (2000) (relying on "the context of this case" to find the terms of a statute not void for vagueness); *Bell v. Dorey Elec. Co.*, 248 Va. 378, 382 (1994) (upholding a statute because its "directives or standards" had "clear and self-evident" meanings). In this case, the context of Disciplinary Rule 1.15(a)(3)(ii) and the absence of a definition of "accounting" or "severance" indicate that the attorney must perform these requirements, *see* Appellee's Br. at 13 (conceding the point), but that context and the lack of definitions do not further suggest that the attorney has unilateral authority to determine the existence or resolution of a dispute.

Roberts sees even "more subtle ambiguities in this Rule," particularly the "equivocation" in the phrases "'funds in which two or more persons claim an interest,' 'the dispute is resolved,' and 'any portion finally determined to belong to the law firm.'" Appellant's Br. at 19 (alterations omitted). He claims that these phrases "imply an artificial degree of orderliness and certainty in disputes regarding funds." *Id.* He wonders whether a "dispute" is the same as two or more persons claiming an interest in the funds such that if all but one person withdraws his claim to the funds "the dispute is resolved." *Id.* He also questions whether these phrases require "a formal mechanism" to resolve the dispute or "an adjudication" to make the "final determination" that the Disciplinary Rule requires. *Id.* (alterations omitted). These hypotheticals are irrelevant to Roberts's ethical violation, and we need neither ask nor answer these questions.

The common thread throughout all of these arguments is a single, erroneous assertion: The dispute is resolved, and the final determination made, when Roberts says so. *See supra* note 7. As we have already stated, however, *see supra* at 9-10, 19-20, we find his interpretation of Disciplinary Rule 1.15(a)(3)(ii) to be unreasonable. It is unnecessary, therefore, to address the precise nature of the dispute-resolution process that would justify an attorney in transferring funds from a trust account to his operating account. There was no dispute-resolution process of any kind in this case. Roberts simply made a determination on his own and in his favor.[12]

Finally, as noted previously, *see supra* at 8, Roberts contends that the Bar arbitrarily enforced Disciplinary Rule 1.15(a)(3)(ii) in this case by concluding that "the merits of the dispute do not matter." Appellant's Br. at 25; *see also id.* at 24 ("[T]he Bar also indicates it does not care about the objective merits of the dispute."). He believes that the true meaning of Disciplinary Rule 1.15(a)(3)(ii), stripped of its vagaries, authorizes him to resolve the dispute on the merits by finding Hayes's claim of interest to be either withdrawn or meritless. As we stated earlier, however, *see supra* at 9-10, 19-20, Disciplinary Rule 1.15(a)(3)(ii) cannot reasonably be read to permit one of two disputants to unilaterally determine that the dispute no longer exists whenever he *asserts* that it no longer exists or that the other is simply wrong. Because we reject Roberts's interpretation of Disciplinary Rule 1.15(a)(3)(ii), we do not see it as a legitimate basis for declaring the Disciplinary Rule void for vagueness.[13]

---

[12] Roberts also argues that Disciplinary Rule 1.15(a)(3)(ii) is void for vagueness because it lacks a "scienter requirement." *See* Appellant's Br. at 14, 17, 20; Reply Br. at 6-7. We do not address this argument because Roberts, by his own admission, intentionally withdrew the trust funds based on his asserted claim of right.

[13] Roberts's principal void-for-vagueness argument targets Disciplinary Rule 1.15(a)(3)(ii). In a few sentences on brief, however, Roberts also asserts that Disciplinary Rule 1.15(b)(5) is also void for vagueness. *See* Appellant's Br. at 36 (claiming that the parameters of "consent" in the Bar's reasoning render the Rule void for vagueness); Reply Br. at 12-13 (same).

## C.  Disciplinary Rule 1.15(b)(5):  Consent & Revocation of Consent

Roberts devotes two assignments of error (5 and 6) to the related arguments that various "legal or contractual authorities, or bodies of authorities" demonstrate that (i) Hayes contractually consented, in the Representation Agreement, to Roberts paying his fees from the trust account; (ii) that Hayes had no right to later withdraw that contractual consent; and (iii) that the Disciplinary Board's findings to the contrary were unconstitutional.  *See* Appellant's Br. at 1-2, 33-40, Reply Br. at 12-13.[14]  He frames these arguments as an attack on the Disciplinary Board's holding, alleging that the Board "implicitly or explicitly" held that "Hayes could withdraw contractual consent unilaterally and without consideration."  Appellant's Br. at 34 (emphases omitted).  Our earlier discussion is dispositive here.

While it is true that the Representation Agreement authorized Roberts to use trust funds to pay legal fees, this authorization was necessarily limited to fees actually due and owing at the time of the withdrawal of funds.  Neither Hayes nor any other client signing that agreement could be understood to have consented to the payment of legal fees that were not due and owing and to have thereby authorized fees that the client claimed were never due at all.  Roberts's argument to the contrary merely assumes his conclusion that he had an unequivocal right to quantum meruit fees prior to, and even despite the potential absence of, any ultimate recovery by Hayes.  Again, as we stated before, *see supra* at 16, we need not affirm or disaffirm this thesis.  It is enough that Hayes both disputed Roberts's claim to fees and asserted an interest in the trust funds in good faith.

---

We find no merit in this assertion.

[14] Given our conclusion that Hayes's consent was limited to fees actually due and owing, we need not address Roberts's further contention that the Board's finding was unprecedented and thus unconstitutional, *see* Appellant's Br. at 33-40; Reply Br. at 12-13.

III.

The Board did not err when it affirmed the Committee's findings that Roberts had violated Disciplinary Rules 1.15(a)(3)(ii) and 1.15(b)(5) and when it affirmed the sanction of a public reprimand with terms.  We thus affirm.

*Affirmed.*