COURT OF APPEALS OF VIRGINIA

Present:    Judges Causey, Raphael and Senior Judge Clements
Argued at Loudoun, Virginia

JAMES D. SHAW, A/K/A
 ROSCOE JAMES SHAW

                                                           OPINION BY
v.        Record No. 1349-22-4                 JUDGE STUART A. RAPHAEL
                                                           JANUARY 23, 2024
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
Daniel S. Fiore, II, Judge[1]

Bradley R. Haywood, Chief Public Defender (Allison H. Carpenter,
Deputy Public Defender, on briefs), for appellant.

Virginia B. Theisen, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General; Tanner M. Russo, Assistant Attorney
General, on brief), for appellee.


Virginia law makes it a Class 6 felony to conceal "a dead body . . . with malicious intent

and to prevent detection of an unlawful act or to prevent the detection of the death or the manner

or cause of death."  Code § 18.2-323.02.  A jury convicted Roscoe James Shaw of that offense

after the battered, bloody, and bruised corpse of Shaw's romantic partner was found in the

apartment they shared, wrapped up in a shower curtain and secured with duct tape that contained

Shaw's DNA.  After working with an accomplice for three days to clean up the apartment and

get rid of the body, Shaw lied to police when questioned about his partner's whereabouts, telling

a police officer that his partner was at the hospital recovering from a seizure.

---

[1] Judge Judith L. Wheat presided at the December 14, 2021 hearing at which the trial
court denied the motion for a bill of particulars.  Judge Fiore presided over the trial and rendered
the other rulings at issue here.

Shaw raises multiple assignments of error, but we conclude that none warrants setting aside the conviction. We reject Shaw's claim that the Commonwealth failed to prove that he acted with "malicious intent." And we find no abuse of discretion by the trial court in excluding the mental-condition testimony of Shaw's expert psychologist. Construing the reach of Code § 19.2-271.6, enacted in 2021, we find that the trial court permissibly determined that the psychologist's testimony showed only that Shaw suffered impaired judgment, not that Shaw lacked the state of mind necessary to have "malicious intent" or to have purposefully concealed his partner's body from the police. So we affirm Shaw's conviction.

BACKGROUND

On appeal, we recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires that we "discard" the defendant's evidence when it conflicts with the Commonwealth's evidence, "regard as true all the credible evidence favorable to the Commonwealth," and read "all fair inferences" in the Commonwealth's favor. *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

*A. Fisher dies in Shaw's apartment.*

In May 2020, Shaw (age 51) and James Fisher (age 31) were romantic partners who lived together in their one-bedroom apartment in Arlington. Shaw called Fisher his "husband," although they had not yet married.[2]

On Tuesday, May 5, Shaw and Fisher entertained several people in their apartment, drinking alcohol and smoking marijuana. The guests included Moika Christopher Nduku,

---

[2] Shaw told police that the couple planned to marry in July 2020.

- 2 -

Jessica Walls, and one or two other friends. Shaw affectionately called Nduku his "nephew" and Jessica his "niece," although neither is a relative.

Fisher died sometime that evening, but the medical examiner classified the cause of death as "undetermined." The autopsy report showed that Fisher "sustained multiple blunt impact injuries of the head which resulted in multiple facial fractures, several of which were re-fractures and of similar nature to previously documented injuries from [an] assault sustained months prior." Fisher also suffered "blunt force trauma of the . . . torso, upper extremities and lower extremities." The medical examiner described the blunt-force trauma as "damage to the tissue caused by . . . essentially a solid, non-edged object."

The injuries were inflicted "hours" before Fisher died, not afterward. Still, the blunt-force trauma to Fisher's upper and lower extremities did not cause his death, though the medical examiner could not say if those injuries contributed to his death.

Fisher also suffered frequent epileptic seizures, and he had a history of not taking his seizure medication. The medical examiner found an injury to Fisher's tongue that might have been caused by seizing. Post-mortem testing found inadequate levels of seizure medication in Fisher's bloodstream, and the medical examiner could not rule out seizure as the cause of death.

At various times after Fisher's death, Shaw blamed Nduku for killing him. Nduku did not testify, and the record does not disclose his whereabouts. It is undisputed, however, that Fisher's body remained in Shaw and Fisher's apartment until the police discovered it late in the evening on Friday, May 8.

*B. Shaw incriminates himself while hiding Fisher's body in his apartment.*

A log of cellphone records showed that Shaw tried five times to reach Nduku between 5:00 a.m. and 6:10 a.m. on Wednesday, May 6—the day after Fisher was last seen alive. Nduku called Shaw at 6:43 a.m.; the call lasted a little more than three minutes. The log reflects more

than a dozen other calls and text messages between them that morning. Twelve hours later, at 11:37 p.m., Nduku texted Shaw, "Hey unk did u get merry maids yet? Or at least start the floors?" Shaw answered, "No."

Shaw called Nduku several times that evening. At 1:27 a.m. the next morning (Thursday, May 7), Nduku texted that he was "Otw." Ten hours later, at 11:31 a.m., Shaw texted Nduku, "Are you ok nephew," to which Nduku replied, "Yea[h] [I'm] okay are u ok?" Shaw responded that he felt "[a] little better," and "will be even better when this situation gets resolved." Two minutes later, Shaw texted, "You don't know of anyone with a truck that can help me move my furniture"? Nduku responded, "Nope."

Shortly after 2:00 p.m., Shaw texted Nduku, "What am I going to do I have to have this furniture moved by today," to which Nduku responded, "Throw them out if you [can't] move with them." Shaw answered that he needed "help moving this heavy ass shit." After 7:00 p.m., Shaw texted Nduku to call him, as "we still have to figure out the move." At 11:58 p.m., Shaw texted Nduku, "you know I need to see you asap." Nduku replied at 12:05 a.m. (Friday, March 8), saying he would "be over there soon." At 12:39 a.m., Nduku texted, "Open the door."

About 20 minutes later, at 12:58 a.m. Nduku texted, "Remem[b]er unk keep the ac on," to which Shaw replied, "I had it on all day." Nduku advised "50 or less." At 10:57 a.m. Friday morning, Shaw texted to Nduku, "Walking to you now." At 12:25 p.m., Shaw texted Nduku, "were you able to complete your mission"? Nduku answered, "F--- no"; he needed a "license." Shaw asked if he knew anyone who had one, to which Nduku replied that he was looking into it.

At about the same time, Shaw phoned and texted Denise Barnes, a four-year acquaintance who lived across the street, asking if she "knew anybody with a moving truck, a U-Haul truck." Barnes did not. She encountered Shaw at the bus stop later that day. Barnes said that Shaw "was crying, hysterical, talking about [wanting to] kill himself." When Shaw

walked out into the middle of the busy road, Barnes retrieved him, walked with him back to his apartment, and went inside with him.  Barnes noticed a chair propped up against the bedroom door.  Shaw told her to "stand back, wait a minute."  He moved the chair and opened the door.

Looking into the bedroom, Barnes saw a "pile of clothing and blanket" on the floor.  Shaw then started "kicking the blanket" and "spitting on it.  He kept saying I hate you, I hate you."  When Barnes asked, "what's going on," Shaw moved the blanket, revealing Fisher's dead body underneath.

Barnes was "shocked" and started to leave.  But Shaw invited her to "look around" the apartment and asked, "didn't I clean the blood up well?"  He said that "the only spot he couldn't clean . . . was . . . near the front door."  That area was covered with a white sheet, which Shaw raised to reveal the stain underneath.  Shaw also "said something about [having] to clean his husband's fingernails with bleach."

Shaw followed Barnes outside, and the two sat together on a bench in the apartment complex.  Pulling out a Speed Stick deodorant, Shaw sniffed it, explaining: "so I don't have to smell the body."  Shaw then asked Barnes "not to call the cops," urging her to give him "till Saturday to bury the body.  Next to the apartment complex was a [trash] dumpster . . . .  He says all he needed to do was find something to get the body into the dumpster."  When Barnes got up to leave, Shaw asked her again not to call the police: "Give me till Saturday to call myself."  She responded, "all right, all right," "okay, okay."  But after she left, she phoned the police anyway.

Linda Allred, a friend of 20 years, testified that she had been trying for several days to get in touch with Shaw.  He briefly visited her apartment sometime on the afternoon of Friday, May 8.[3]  Shaw told her he had lied about his whereabouts for the past three days.  He said that

_____

[3] Allred initially testified that Shaw visited her on a Sunday, but after Shaw's counsel refreshed her recollection with an audiotaped interview, Allred said that the visit occurred on a Friday, one of her days off from work.

"his nephew had beat[en] his boyfriend to death and that [Fisher] had been in the house dead for three days." Shaw asked if he could stay with Allred for a couple of days. She refused, told him to leave, and said she was calling the police. She did.

At 3:28 p.m. on Friday, Nduku texted Shaw, "Grab bleach soap and glove[s]." Shaw responded, "[I'm] trying to now."

Around 4:00 p.m., Arlington County Police Officer Taylor Williams went to Shaw's apartment for a welfare check. She was joined by Officers Jason Pardee and Kevin Roman. Officer Williams testified that the police had received a tip from a probation officer whose probationer reported "FaceTiming" with Shaw and that Shaw claimed to have "a dead body in his apartment." Officer Williams knew from a previous encounter that Shaw and Fisher were romantic partners. The officers approached as Shaw exited his apartment and closed the outer door of the building; they greeted him on the steps outside.

Shaw declined Officer Williams's request to step back inside the apartment to talk. Shaw was wearing a surgical mask and coughing; he said he had "COVID and . . . wasn't feeling very well." Williams asked if anyone inside "was hurt," to which Shaw replied "No." Williams then asked about Fisher.

Shaw said that Fisher had suffered a seizure the night before and that "medics [had] responded and transported him to Virginia Hospital Center." Shaw claimed that he was on his way to visit him there. Williams again asked to speak with Shaw inside the apartment, but Shaw again declined, attributing it to COVID-19 and not feeling well. Shaw said it "made him uncomfortable to go inside."

Officer Pardee testified that Shaw was "calm and polite" during that encounter; "friendly and calm." After speaking with the three officers, Shaw briefly returned to his apartment before departing on foot, heading north.

Officer Williams called Virginia Hospital Center and confirmed that Fisher had not been admitted. Williams instructed Officer Pardee to return to Shaw's apartment. Williams then received a dispatch reporting a possible dead body inside. On her way back to the apartment, Officer Williams was flagged down by Barnes, who also told her there was a dead body inside.[4]

No one answered when Officer Williams knocked on the outer door of Shaw's apartment building. Nor when Williams announced the officers' presence through Shaw's apartment window. Williams secured the perimeter and waited for the SWAT team to arrive to execute a search warrant.

Shaw texted Barnes at 5:46 p.m. "how could you," and "[I] trusted you." "My nephew did it [I] didn't." "I told you that." "And now [ACPD] is at my house." At 5:50 p.m., Shaw texted he was "[d]isposing" of his smartphone. Shaw again complained to Barnes, "I really trusted you," and "[a]s soon as I told you the police showed up."

*C. Police discover the body.*

Entering the apartment at 10:10 p.m., the SWAT team, police officers, and medics discovered Fisher's body on the bedroom floor, under a pile of clothing with a blanket on top. Fisher's body was clothed and wrapped in a shower curtain secured with duct tape. Four plastic trash bags covered his head. The apartment was very cold; the thermostat had been turned all the way down, causing the air-conditioning filter to frost over.

Later testing of the duct tape revealed a DNA mixture for which Shaw and Nduku could not be eliminated as contributors. The Commonwealth's expert in DNA statistical analysis testified that a match with Shaw's DNA was "46 million times more probable than a coincidental

---

[4] Barnes first said that Shaw had tried to show her a picture of the body on his smartphone, and then that she had seen the body through the window. But when Officer Williams told Barnes that the apartment layout made that impossible, Barnes admitted she had been inside the apartment and had seen the body in Shaw's bedroom.

match" to an unrelated person of the same race as Shaw, and a match with Nduku's DNA was "420 million times more probable than a match to an unrelated" person of the same race.

> D. *Shaw makes admissions to his mother and the police.*

At about 2:30 p.m. the next day—Saturday, May 9—Shaw texted his mother, asking for $100-200 to "rent a hotel room." He said he couldn't call her because his phone was being traced. He wrote, "my mate was beat to death in my house. I haven't been arrested [and] am still on the street." Shaw said he planned "to talk to the investigators tomorrow [but] wanted to first talk to you on [M]other's day just in case." Shaw assured his mother that he was innocent of "this murder" but he was "most worried" about his probation being revoked with "10 years back up time" hanging over him. He added, "my lover . . . was killed in my house[,] mom[,] he [was] killed [T]uesday night and remained in my house for 3 days[.] [I]'m not going . . . to prison for murder[.] [I] didn[']t do it."

Shaw surrendered to Arlington police the next day. After waiving his *Miranda*[5] rights, he gave a lengthy videotaped interview. Shaw said that he, Nduku, Jessica, and others were drinking alcohol and smoking marijuana in Shaw's apartment on Tuesday afternoon while Fisher was looking at a new cellphone in the bedroom. Shaw said he became "extremely high" and told Fisher he needed to sleep, after which Shaw "blacked out." Shaw got up in the early morning to use the bathroom. He noticed Fisher on the living-room floor and assumed that Fisher had passed out from drinking too much, something Fisher had done before. Shaw said that, after going back to sleep, he was awakened by a phone call from Jessica after 4:00 a.m. Seeing Fisher still on the floor, Shaw said he nudged his body, discovering that Fisher was dead. Jessica

---

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

arrived and rang the doorbell between 4:00 and 5:00 a.m. Shaw said that Jessica saw Fisher's body and screamed.[6] He pushed Jessica out the door, and they both left.

Shaw claimed that he did not return to his apartment until Friday, by which time Fisher's body had been moved from the living room to the bedroom, and the "blood was gone." Shaw told police that Nduku must have done that. Shaw also described his Friday afternoon encounter with Officer Williams. He said he didn't want the police in his house because he was "scared" and felt he needed "a lawyer present." When asked why he hadn't called police during the three days that Fisher lay dead in the apartment, Shaw said that he "panicked." He said he suffered from PTSD and depression.

*E. Shaw loses several pretrial motions.*

The grand jury returned an indictment under Code § 18.2-323.02, alleging that "[o]n or about May 8, 2020," Shaw concealed a dead body "with malicious intent and to prevent detection of an unlawful act or to prevent the detection of the death or the manner or cause of death." The trial court denied Shaw's motion for a bill of particulars, his motion to dismiss the indictment on the ground that the statute is unconstitutionally vague, and his motion *in limine* to exclude prior-bad-act evidence.

The trial court granted the Commonwealth's motion to exclude the testimony of Shaw's expert, Dr. Sara Boyd, Ph.D., a licensed clinical psychologist. Shaw proffered that Dr. Boyd would supply evidence tending to negate the mens rea for the offense; Shaw provided a copy of Dr. Boyd's letter setting forth her findings. The trial court conducted a pretrial hearing at which Dr. Boyd testified and was cross-examined. Shaw then supplemented the record with a post-hearing declaration from Dr. Boyd.

---

[6] Jessica did not testify at trial.

- 9 -

On the first day of trial, the court issued a letter opinion explaining its rationale for excluding Dr. Boyd's testimony. *See Commonwealth v. Shaw*, 109 Va. Cir. 356 (Arlington 2022). The court found, among other things, that Dr. Boyd did not identify how Shaw's mental condition prevented him from having the state of mind required to maliciously conceal Fisher's body or act purposefully to prevent its discovery. *Id.* at 359. The court concluded that Dr. Boyd's testimony would require the "jury to speculate [about] which of Shaw's numerous mental health symptoms impaired the differing intent requirements and whether they did so in a manner significant enough to negate both intent requirements under the statute." *Id.* at 362.

*F. Shaw is tried, convicted, and sentenced.*

Shaw's jury trial lasted three days. After the Commonwealth called more than a dozen witnesses in its case-in-chief, the trial court denied Shaw's motion to strike. The court received Shaw's extensive written proffer of Dr. Boyd's opinions and again confirmed its ruling excluding her testimony. The court rejected Shaw's argument that the prosecution had opened the door to Dr. Boyd's testimony by including Shaw's statement that he suffered from PTSD and depression in the portion of the videotaped police interview shown to the jury.

Shaw called one witness in his defense, a SWAT team member who testified that the dead-body smell he encountered when entering Shaw's apartment on May 8 grew stronger as the officers made their way from the living room to the bedroom. The trial court denied Shaw's renewed motion to strike.

At the charging conference, the trial court overruled Shaw's objection to the Commonwealth's proposed jury instruction on the element of malice. The jury found Shaw

guilty of concealing a dead body, and the trial court sentenced him to five years in prison and

three years of supervised probation.[7]  Shaw noted a timely appeal.

ANALYSIS

Shaw's ten assignments of error can be grouped into three categories.[8]

A.  *The trial court properly defined and applied the "malicious intent" element.*

Shaw argues that the trial court erred when instructing the jury on the "malicious intent"

element of Code § 18.2-323.02 (Assignment of Error 11).  He claims that, under his preferred

definition, the Commonwealth failed to prove that he concealed Fisher's body with "an ill will or

an evil mind."  Shaw Br. 46.  He also argues that the trial court should have granted his motion

to strike the evidence for failing to prove malicious intent (Assignment of Error 10).  And he

argues that the malice requirement renders the statute unconstitutionally vague (Assignment of

Error 7).  We disagree.

1.  *Code § 18.2-323.02 adopts the ordinary meaning of "malicious intent."*

The meaning of "malicious intent" in Code § 18.2-323.02 presents a question of statutory

interpretation that we review de novo.  *E.g.*, *Rock v. Commonwealth*, 76 Va. App. 419, 431

(2023).  We likewise review de novo "whether a jury instruction accurately states the relevant

law."  *Pergolizzi v. Bowman*, 76 Va. App. 310, 335 (2022) (quoting *Watson v. Commonwealth*,

298 Va. 197, 207 (2019)).

Code § 18.2-323.02 provides:

> Any person who transports, secretes, conceals or alters a dead
> body, as defined in § 32.1-249, with malicious intent and

---

[7] The five-year sentence was the statutory maximum for this Class 6 felony.  *See* Code § 18.2-10(f).

[8] Shaw originally designated eleven assignments of error but abandoned the sixth assignment in his opening brief.  Shaw Br. 4 n.1.  This opinion retains the original numbering when referencing the assignments of error.

> to prevent detection of an unlawful act or

> to prevent the detection of the death or the manner or cause
> of death

is guilty of a Class 6 felony.

A "dead body" means "a human body or such parts of such human body from the condition of which it reasonably may be concluded that death occurred." Code § 32.1-249.

Because the statute does not define "malicious intent," the trial court borrowed the definition of "malice" from the Virginia Criminal Model Jury Instructions. *See* Model Jury Instrs.—Crim. Nos. 33.220, 37.200. The model instructions offer the "identical" definition of malice for the crimes of homicide and malicious wounding. *Id.* at 37.100. It reads in part:

> Malice is that state of mind which results in the intentional doing
> of a wrongful act to another without legal excuse or justification, at
> a time when the mind of the actor is under the control of reason.
> Malice may result from any unlawful or unjustifiable motive
> including anger, hatred, or revenge. You may, but are not required
> to, infer malice from any deliberate, willful, and cruel act against
> another, however sudden.

*Id.* at 33.220, 37.200.

"Before the last century, the *mens rea* required to be proven for particular offenses was often described in general terms like 'malice.'" *Clark v. Arizona*, 548 U.S. 735, 766 (2006). Although there has been a trend in other jurisdictions to use "more specific descriptions" instead of "malice," *id.*, our General Assembly has continued to use *malice* "as an element of numerous statutory offenses," *Saunders v. Commonwealth*, 31 Va. App. 321, 324 (2000).

When Code § 18.2-323.02 was enacted, *see* 2007 Va. Acts ch. 436, the definition of malice was "well-settled in Virginia," *Bell v. Commonwealth*, 11 Va. App. 530, 532-33 (1991) (quoting *Long v. Commonwealth*, 8 Va. App. 194, 198 (1989)). "Malice inheres in the doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will." *Id.* at 533. Our appellate courts have used that definition repeatedly since then. For instance, in *Meade v.*

- 12 -

*Commonwealth*, 74 Va. App. 796 (2022), we upheld a conviction for maliciously shooting into an occupied building, noting that our "Supreme 'Court has long defined malice as "the doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will.""" *Id.* at 813 (quoting *Watson-Scott v. Commonwealth*, 298 Va. 251, 255-56 (2019)). *See also Synan v. Commonwealth*, 67 Va. App. 173, 187 (2017) ("Malice is evidenced either when the accused acted with a sedate, deliberate mind, and formed design, or committed a purposeful and cruel act without any or without great provocation." (quoting *Branch v. Commonwealth*, 14 Va. App. 836, 841 (1992))).

The same definition has been applied across the board to various statutes requiring malice. *See Saunders*, 31 Va. App. at 324 (collecting statutes). Such offenses range from burning a dwelling (Code § 18.2-77), to setting fire to woods, fences, and grass (Code § 18.2-86), to maliciously activating fire alarms (Code § 18.2-279). *See id.* (defining malice as "that state of mind [that] results in the intentional doing of a wrongful act to another without legal excuse or justification, at a time when the mind of the actor is under the control of reason" (quoting *Lynn v. Commonwealth*, 27 Va. App. 336, 344-45 n.1 (1998))).

The General Assembly is presumed to be aware of Virginia's appellate decisions. *Weathers v. Commonwealth*, 262 Va. 803, 805 (2001). So it must have intended the ordinary definition to apply to the "malicious intent" element in Code § 18.2-323.02.

Shaw resists that conclusion. He says that the Model Jury Instruction for malice is inappropriate because homicide and malicious wounding are *malum in se*—crimes that are "inherently immoral"—while maliciously concealing a dead body is only *malum prohibitum*—"a crime merely because it is prohibited by statute, although the act itself is not necessarily immoral." *Malum In Se*, *Malum Prohibitum*, *Black's Law Dictionary* (11th ed. 2019). He

maintains that malice for a *malum prohibitum* offense should be restricted to acts committed "with an ill will or an evil mind." Shaw Br. 46.

Yet Shaw points to no Virginia caselaw to support that distinction. To the contrary, our appellate courts have consistently held that malice covers more than just ill will. *E.g.*, *Essex v. Commonwealth*, 228 Va. 273, 280 (1984) ("The authorities are replete with definitions of malice, but a common theme running through them is a requirement that a wrongful act be done 'wil[l]fully or purposefully.'" (quoting *Williamson v. Commonwealth*, 180 Va. 277, 280 (1942))). To be sure, "ill will" may qualify as malice, but it is listed only in the disjunctive: "Malice inheres in the doing of a wrongful act intentionally, *or* without just cause or excuse, *or* as a result of ill will." *Dawkins v. Commonwealth*, 186 Va. 55, 61 (1947) (emphasis added); *Hamm v. Commonwealth*, 16 Va. App. 150, 153-54 (1993) (same). And we have explicitly said that "[m]alice is *not confined to ill will*." *Williams v. Commonwealth*, 13 Va. App. 393, 398 (1991) (emphasis added). It "includes any action flowing from a wicked or corrupt motive, done with an evil mind or wrongful intention, where the act has been attended with such circumstances as to carry in it the plain indication of a heart deliberately bent on mischief." *Id.*

Because our appellate courts have not used a different definition of malice for *malum prohibitum* offenses, the General Assembly likely did not have that notion in mind either when it enacted this code section.[9] So we find no error in the trial court's using the Model Jury Instruction to define malice under Code § 18.2-323.02.

---

[9] Shaw also mistakenly relies on civil cases that define "common-law malice" for the tort of defamation "as 'some sinister or corrupt motive such as hatred, revenge, personal spite, ill will, or desire to injure the plaintiff.'" *Great Coastal Express, Inc. v. Ellington*, 230 Va. 142, 149 n.3 (1985) (quoting *Preston v. Land*, 220 Va. 118, 120-21 (1979)), *overruled in part on other grounds by Cashion v. Smith*, 286 Va. 327, 338 (2013). *Great Coastal* explained that civil-defamation law is "vexed by two competing species of malice." *Id.* The Court distinguished "common-law malice" from the "actual malice" standard required by the Free Speech Clause of the First Amendment for defamation claims against public figures—so-called "*New York Times* malice," after *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964). *Id.* We find nothing in

- 14 -

We also disagree with Shaw's suggestion that applying that general definition of malice will deprive the malicious-intent element of meaning. Malicious intent remains a critical element of the offense. As originally introduced, the bill that became Code § 18.2-323.02 criminalized concealing a dead body *only* "with the intent to prevent detection of the death or the manner or cause of death." H.B. 1777 (Jan. 10, 2007). The House Courts of Justice Committee added the requirement that the defendant do so "with malicious intent," H.B. 1777 (Jan. 22, 2007) (Amendment in the Nature of a Substitute), and that language was included in the enacted bill. *See* 2007 Va. Acts ch. 436.

That drafting history shows that the General Assembly concluded that concealing a dead body *without* "malicious intent" would not be blameworthy enough to warrant criminal sanctions. The trial court suggested one example of how the malice requirement protects innocent conduct: placing "a sheet over a dead body for the purpose of respect for the decedent" would not be a crime. The Commonwealth offered another: "the relative of a recently deceased person who died in the home may tell law enforcement that the deceased is alive to allow time for a religious official to perform a sacrament prior to the removal of the body from the home." Commonwealth Br. 34-35. A third example was suggested at oral argument: a person might conceal his spouse's death from a police officer, in the presence of the couple's child, to protect the child from shock. In those examples, the actor has knowingly concealed a dead body, but it was not a "wrongful act" done "intentionally, or without just cause or excuse, or as a result of ill will." *Bell*, 11 Va. App. at 533 (quoting *Long*, 8 Va. App. at 198).

---

*Great Coastal* that hints that the "common-law malice" standard in defamation cases also informs the meaning of malice in criminal statutes.

*2. The evidence sufficed to prove Shaw's malicious intent.*

Shaw argues that the Commonwealth's evidence failed to prove beyond a reasonable doubt that Shaw acted with malicious intent when he concealed Fisher's body from Officer Williams. "When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "The relevant issue on appeal is, 'upon review of the evidence in the light most favorable to the prosecution, whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Lambert v. Commonwealth*, 298 Va. 510, 515 (2020) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). Applying that deferential standard, we conclude that the jury could reasonably find that Shaw acted with "malicious intent" because he committed "a wrongful act intentionally, or without just cause or excuse, or as a result of ill will." *Bell*, 11 Va. App. at 533 (quoting *Long*, 8 Va. App. at 198).

The jury had ample evidence from which to find that Shaw acted with malicious intent. While standing on the front steps of his apartment building, Shaw lied to Officer Williams when she questioned him about Fisher's whereabouts. Shaw failed to mention that Fisher's corpse was lying inside the refrigerated apartment. What is more, Shaw failed to mention that Fisher had suffered multiple blunt-force traumas, that Fisher had been dead for three days, and that Shaw believed that Fisher had been murdered. Instead, Shaw told Officer Williams that Fisher had suffered a seizure and was at the hospital. Embellishing the lie, Shaw said he was on his way there to visit him.

Days earlier, Shaw and Nduku had wrapped Fisher's body in a shower curtain, leaving their DNA on the duct tape. Barnes witnessed Shaw kick the blanket covering Fisher's corpse,

- 16 -

spit on it, and curse at it, saying "I hate you, I hate you." Shaw begged both Barnes and Allred not to call the police so he would have time to get rid of the body, perhaps in the apartment's dumpster. Shaw urged Nduku to find a truck to move it, and their texts evidenced a coordinated effort to clean up the blood. Shaw even bragged to Barnes about how well he had done that. Shaw also admitted to his mother that he had witnessed Fisher's death, blaming Nduku for killing him and calling it a "crime" and a "murder." And when explaining why he had not called the police, Shaw admitted to his mother that he was "most worried" that his probation would be revoked and that his ten years' back-up time would be reimposed.

That evidence more than sufficed for a reasonable jury to conclude that Shaw intentionally concealed Fisher's body and that he did so "with malicious intent and to prevent detection of an unlawful act or to prevent the detection of the death or the manner or cause of death." Code § 18.2-323.02.

### 3. Shaw's void-for-vagueness challenge lacks merit.

Shaw asks that we strike down Code § 18.2-323.02 on the ground that the malice element renders it unconstitutionally vague. "We review questions of statutory constitutionality de novo," *Toghill v. Commonwealth*, 289 Va. 220, 227 (2015), including "a facial constitutional challenge" based on the void-for-vagueness doctrine, *Shin v. Commonwealth*, 294 Va. 517, 526 (2017).

"When a party makes a vagueness challenge, he generally cannot argue vagaries in aspects of the challenged law that do not directly affect him—a legal claim often called a 'facial challenge.'" *Roberts v. Va. State Bar*, 296 Va. 105, 123 (2018) (collecting cases). In other words, "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Vill. of Hoffman Est. v. Flipside, Hoffman Est., Inc.*, 455 U.S. 489, 495 n.7 (1982) (quoting *Parker v. Levy*, 417 U.S. 733, 756 (1974)). Instead, the "litigant must first show 'that

the statute in question is unconstitutional as applied to him.  [I]f a statute is constitutional as applied to a litigant, he . . . lacks standing to assert a facial constitutional challenge to it, and the statute is not facially unconstitutional because it has at least one constitutional application.'" *Shin*, 294 Va. at 526 (alteration in original) (quoting *Toghill*, 289 Va. at 228).

"The only recognized exception to this general rule involves vagueness challenges to laws that allegedly violate First Amendment rights." *Roberts*, 296 Va. at 124.  But that exception does not apply here because Shaw does not claim that the First Amendment protected his right to hide Fisher's dead body from police.[10]

Shaw's facial challenge fails at the start because he does not claim that Code § 18.2-323.02 is unconstitutionally vague as applied to him.  He has not claimed, for instance, that ordinary people would not understand that the statute criminalizes what Shaw did here: conceal a battered corpse in his apartment for three days and lie to police when asked about it for fear of having his probation revoked.  Because Shaw has failed to set forth any such claim, his constitutional challenge necessarily fails.

B.  *The trial court did not abuse its discretion in excluding Dr. Boyd's mental-condition testimony (Assignments of Error 1-5).*

Shaw raises five assignments of error challenging the trial court's decision to exclude Dr. Boyd's testimony.  "Decisions regarding the admissibility of evidence 'lie within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of discretion.'" *Blankenship v. Commonwealth*, 69 Va. App. 692, 697 (2019) (quoting *Michels v. Commonwealth*, 47 Va. App. 461, 465 (2006)).  "Only when reasonable jurists could not differ

---

[10] Shaw thus misplaces his reliance on *Coleman v. City of Richmond*, 5 Va. App. 459 (1988), where we applied the overbreadth exception to consider the defendant's First Amendment challenge to the loitering ordinance under which he was convicted.  *Id.* at 463.

can we say an abuse of discretion has occurred." *Turner v. Commonwealth*, 65 Va. App. 312, 327 (2015) (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)).

> 1. *Code § 19.2-271.6 overrules* Stamper*'s prohibition on using mental-condition evidence to negate mens rea.*

Resolving whether the trial court properly excluded Dr. Boyd's mental-condition testimony requires that we determine whether that testimony was admissible under Code § 19.2-271.6, a statute enacted in 2021. *See* 2021 Va. Acts Spec. Sess. I ch. 523. The statute provides:

> In any criminal case, evidence offered by the defendant concerning the defendant's mental condition at the time of the alleged offense, including expert testimony, is relevant, is not evidence concerning an ultimate issue of fact, and shall be admitted if such evidence (i) tends to show the defendant did not have the intent required for the offense charged and (ii) is otherwise admissible pursuant to the general rules of evidence.

Code § 19.2-271.6(B). "[T]he defendant must show that his condition existed at the time of the offense and that the condition satisfies the diagnostic criteria for (i) a mental illness, (ii) a developmental disability or intellectual disability, or (iii) autism spectrum disorder . . . ." *Id.* Subsection (A) defines "mental illness" as "a disorder of thought, mood, perception, or orientation that significantly impairs judgment or capacity to recognize reality." Code § 19.2-271.6(A).

The 2021 statute was intended to displace the common-law rule followed by our Supreme Court in *Stamper v Commonwealth*, 228 Va. 707 (1985).[11] *See Calokoh v. Commonwealth*, 76

---

[11] Notably, however, the 2021 statute provides that "[n]othing in this section shall be construed as permitting the introduction of evidence of voluntary intoxication." Code § 19.2-271.6(G). *See generally Riley v. Commonwealth*, 277 Va. 467, 481 (2009) ("It is well settled that voluntary intoxication furnishes no excuse for the commission of a criminal offense . . . the only exception being deliberate and premeditated murder."); *Montana v. Egelhoff*, 518 U.S. 37, 44-51 (1996) (plurality opinion) (upholding Montana's prohibition on the

Va. App. 717, 731-32 (2023). *Stamper* had held "that evidence of a criminal defendant's mental state at the time of the offense is, in the absence of an insanity defense, irrelevant to the issue of guilt." 228 Va. at 717.

*Stamper* noted that jurisdictions that permitted evidence of a mental condition short of insanity fell into two categories. First, some permitted the defendant to introduce evidence of "diminished capacity." *Id.* at 716. "Though the term 'diminished capacity' has been given different meanings, California, a jurisdiction with which the concept has traditionally been associated, understood it to be simply a '"showing that the defendant's mental capacity was reduced by mental illness, mental defect or intoxication . . . ."'" *Clark*, 548 U.S. at 772 n.41 (quoting *People v. Berry*, 556 P.2d 777, 781 (Cal. 1976)).[12] *Stamper* rejected that theory, however, reasoning that it "represents 'a fundamental change in the common law theory of [criminal] responsibility.'" 228 Va. at 716 (alteration in original) (quoting *Fisher v. United States*, 328 U.S. 463, 476 (1946)).

The second group of jurisdictions, *Stamper* noted, permitted the introduction of mental-condition evidence "to show, by circumstantial evidence, that the requisite specific intent did not in fact exist." *Id.* *Stamper* rejected that theory as well, calling it "an invasion, by expert opinion on the ultimate fact in issue, of the province of the factfinder." *Id.* The Court voiced apprehension that "[t]he state of knowledge in the fields of medicine and psychiatry is subject to constant advance and change. . . . The courts cannot, and should not, become dependent upon these subtle and shifting gradations for the resolution of each specific case." *Id.*

use of voluntary intoxication to negate the mens rea for a criminal offense, tracing the history of the common-law rule excluding such evidence).

[12] California later abrogated that doctrine. *See* Cal. Penal Code §§ 25(a), 28(a)-(b), 29.

So the Court in *Stamper* retained the common-law rule that a defendant's mental condition either renders him not guilty by reason of insanity or is inadmissible altogether to negate intent. *Id.* at 716-17. "Unless an accused contends that he was beyond that borderline when he acted, his mental state is immaterial to the issue of specific intent." *Id.* at 717. Some of our sister States following this rule have dubbed it "the 'all-or-nothing' approach"—that is, "a 'defendant must either establish his insanity as a complete defense to or excuse for the crime, or he must be held to full responsibility for the crime charged.'" *Barnett v. State*, 540 So. 2d 810, 812 (Ala. Crim. App. 1988) (quoting C.T. Drechsler, Annotation, *Mental or emotional condition as diminishing responsibility for crime*, 22 A.L.R.3d 1228, § 4 at 1236 (1968)).[13]

Code § 19.2-271.6 removes *Stamper*'s prohibition on the introduction of mental-condition evidence to negate mens rea. *See Calokoh*, 76 Va. App. at 731 ("Code § 19.2-271.6 permits defendants to introduce evidence of a mental condition that previously would not have been permitted under the common law."). By providing that such evidence "is not evidence concerning an ultimate issue of fact," Code § 19.2-271.6(B), the statute overrides *Stamper*'s conclusion that permitting such testimony would be "an invasion, by expert opinion on the ultimate fact in issue," 228 Va. at 716.

But the statute does not permit mental-condition evidence to support a diminished-capacity theory if such evidence does not show that the defendant lacked the state of mind to commit the offense.[14] "[T]o establish the underlying mental condition the defendant must show

---

[13] In 2006, the United States Supreme Court held that the Due Process Clause did not require States to permit criminal defendants to offer evidence of mental illness short of insanity to negate the specific intent for a crime. *Clark*, 548 U.S. at 769-73.

[14] We noted in *Calokoh* that the crimes of rape and animate-object penetration did "not require proof that the defendant harbor a specific intent to have intercourse without the victim's consent, only the general intent evidenced by the act of committing the offense itself. . . . The lack of consent required for rape involves the victim's mental state, not the defendant's." 76 Va. App. at 733 (quoting *Gonzales v. Commonwealth*, 45 Va. App. 375, 382 (2005) (en banc)).

that his condition existed at the time of the offense and that the condition satisfies the diagnostic criteria for," among other things, "a mental illness." Code § 19.2-271.6(B). The term "mental illness," in turn, "means a disorder of thought, mood, perception, or orientation that significantly impairs judgment or capacity to recognize reality." Code § 19.2-271.6(A). If the text had stopped there, the statute might have permitted the introduction of mental-condition evidence to show diminished capacity. But the text continues: the evidence must "tend[] to show the defendant did not have the intent required for the offense charged." Code § 19.2-271.6(B)(i). We agree with Shaw that "Code § 19.2-271.6 allows evidence of a mental disorder to explain why a defendant did not have a requisite mental state in a specific instance, whether or not the disorder prevented the defendant from forming culpable mental states altogether." Shaw Reply 4.[15]

> 2. *The evidence must show how the defendant's impaired mental condition negates mens rea.*

At oral argument, both parties agreed that a mental-health expert's testimony, to be admissible under Code § 19.2-271.6, must go further than showing merely that the defendant

---

"Because Code § 19.2-271.6 . . . did not amend the elements of rape or animate object penetration, the trial court did not err when it . . . [told] the jury that the evidence of [the defendant's] mental condition could not be considered in relation to whether the victim consented." *Id.* at 734.

[15] Shaw stated on brief that Code § 19.2-271.6 "limits introduction of mental health evidence to cases with a *specific intent* element." Shaw Reply 10 (emphasis added). Courts in other jurisdictions, however, have disagreed about whether mental-condition evidence may be used to negate a general-intent offense. *Compare United States v. Pohlot*, 827 F.2d 889, 897 n.4 (3d Cir. 1987) ("Most states . . . limit psychiatric evidence to specific intent crimes on the theory that mental abnormality can virtually never disprove the mens rea required for general intent crimes so that psychiatric evidence would be misleading."), *with United States v. Odeh*, 815 F.3d 968, 979 (6th Cir. 2016) (holding that evidence of defendant's PTSD could have negated the general intent element at issue there by showing that the defendant "did not know that her answers on the naturalization application were false"). We did not reach that question in *Calokoh* because the Commonwealth abandoned the argument on appeal. *See* 76 Va. App. at 725 n.1. Likewise, we do not reach that question here because the parties agree that Code § 18.2-323.02 is a specific-intent offense.

- 22 -

suffered impaired judgment or diminished capacity. The testimony must explain how the

defendant did not have the state-of-mind required to commit the offense. Both sides, on brief

and at oral argument, relied on authorities outside of Virginia to explore that distinction.

Because we agree that non-Virginia authorities provide helpful guidance, we summarize the

approaches taken in other jurisdictions.

Like Virginia, "a substantial majority of the States" have moved away from the common-

law's all-or-nothing approach. *Clark*, 548 U.S. at 800 (Kennedy, J., dissenting). The Model

Penal Code, approved by the American Law Institute in 1962, stated in § 4.02 that "[e]vidence

that the defendant suffered from a mental disease or defect is admissible whenever it is relevant

to prove that the defendant did or did not have a state of mind that is an element of the offense."

Model Penal Code xi, 62-63 (1984). Shaw notes that "Code § 19.2-271.6 is based on MPC 4.02

and uses the same evidentiary framework." Shaw Br. 24. The American Bar Association

adopted a similar standard, permitting "mental condition" evidence if it "tends to show the

defendant did or did not have the mental state required for the offense." *Am. Bar Ass'n,*

*Criminal Justice Standards on Mental Health* 47 (2016).

Today, more than 30 States permit the introduction of mental-condition evidence to show

that the defendant lacked the required intent to commit the offense.[16] Sixteen remain all-or-

---

[16] *See* Alaska Stat. § 12.47.020(a); Ark. Code Ann. § 5-2-303; Cal. Penal Code § 28(a); *People v. Vanrees*, 125 P.3d 403, 405, 409 (Colo. 2005); *State v. Burge*, 487 A.2d 532, 539 (Conn. 1985); Del. Code Ann. tit. 11 § 402(b); Haw. Rev. Stat. Ann. § 704-401; Idaho Code Ann. § 18-207(3); *People v. Valdez*, 208 N.E.3d 526, 546-52 (Ill. App. Ct. 2022); Kan. Stat. Ann. § 21-5209; *Robinson v. Commonwealth*, 569 S.W.2d 183, 185 (Ky. Ct. App. 1978); Me. Rev. Stat Ann. tit. 17-A, § 38; *Hoey v. State*, 536 A.2d 622, 632-33 (Md. 1988); *Commonwealth v. Huang*, 180 N.E.3d 968, 976 n.7 (Mass. 2022); Mo. Rev. Stat. § 552.015(8); Mont. Code Ann. § 46-14-102; *State v. Martinez*, 924 N.W.2d 295, 303 (Neb. 2019); N.J. Stat. Ann. § 2C:4-2; *People v. Segal*, 429 N.E.2d 107, 111 (N.Y. 1981); N.D. Cent. Code Ann. § 12.1-04.1-01; Or. Rev. Stat. § 161-300; *Commonwealth v. Walzack*, 360 A.2d 914, 920 (Pa. 1976); *State v. LaCroix*, 911 A.2d 674, 679 (R.I. 2006); *Nesbit v. State*, 452 S.W.3d 779, 798 (Tenn. 2014); Utah Code Ann. § 76-2-305(2)(a); *State v. Webster*, 179 A.3d 149, 163 (Vt. 2017); *State v. Greene*, 984 P.2d 1024, 1029 (Wash. 1999); *State v. Joseph*, 590 S.E.2d 718, 719, 724 (W. Va.

nothing jurisdictions.[17]  Only a handful permit mental-condition evidence to show diminished

capacity as a defense or excuse to an offense,[18] although "[a]cross jurisdictions, and even within

jurisdictions, the term 'diminished capacity' has varied meanings and significance."  *State v.*

*Congress*, 114 A.3d 1128, 1133 (Vt. 2014).

Like most States, federal appeals courts have consistently held that a federal criminal

defendant may offer mental-condition evidence to negate mens rea, reasoning that such evidence

is implicitly permitted by the Insanity Defense Reform Act of 1984 ("IDRA"), Pub. L. No.

98-473, Title II, § 402(a), 98 Stat. 2057, § 20, *recodified* at 18 U.S.C. § 17.[19]  Codifying the

---

2003); *Pickering v. State*, 464 P.3d 236, 259 (Wyo. 2020).  *See also State v. Gourlay*, 802 A.2d 1203, 1205 (N.H. 2002) (holding that defendant's expert was properly permitted to offer testimony about defendant's cognitive deficits but not to opine on whether he had the ability to form the requisite intent).

[17] *See Barnett*, 540 So. 2d at 812 (Ala. Crim. App.); *State v. Malone*, 444 P.3d 733, 735 (Ariz. 2019); *Jackson v. United States*, 76 A.3d 920, 933-34 (D.C. 2013); *Chestnut v. State*, 538 So. 2d 820, 820 (Fla. 1989); *Virger v. State*, 824 S.E.2d 346, 363-64 (Ga. 2019); *Marley v. State*, 747 N.E.2d 1123, 1128 (Ind. 2001); *State v. Murray*, 375 So. 2d 80, 87 (La. 1979); *People v. Carpenter*, 627 N.W.2d 276, 285 (Mich. 2001); *State v. Anderson*, 789 N.W.2d 227, 237 (Minn. 2010); *Stevens v. State*, 867 So. 2d 219, 224 (Miss. 2003); *Crawford v. State*, 121 P.3d 582, 591 (Nev. 2005); *State v. Fulmer*, 883 N.E.2d 1052, 1058 (Ohio 2008); *Frederick v. State*, 37 P.3d 908 (Okla. Crim. App. 2001); *State v. Tennant*, 714 S.E.2d 297, 300 & n.2 (S.C. 2011); *Darnes v. State*, 118 S.W.3d 916, 919 (Tex. Ct. App. 2003); *Steele v. State*, 294 N.W.2d 2, 3 (Wis. 1980).

[18] *See Lamasters v. State*, 821 N.W.2d 856, 869 (Iowa 2012); *State v. Balderama*, 88 P.3d 845, 853 (N.M. 2004); *State v. Page*, 488 S.E.2d 225, 231-32 (N.C. 1997); *State v. Schouten*, 707 N.W.2d 820, 825 (S.D. 2005).  *See also* Colo Rev. Stat. Ann. § 18-1-803 (permitting, but only for "offenses committed before July 1, 1995," introduction of "[e]vidence of an impaired mental condition . . . though not legal insanity . . . as bearing upon the capacity of the accused to form the culpable mental state which is an element of the offense charged").

[19] *See United States v. Davis*, 863 F.3d 894, 907 (D.C. Cir. 2017); *United States v. Schneider*, 111 F.3d 197, 201 (1st Cir. 1997); *United States v. Dupre*, 462 F.3d 131, 137-38 & n.8 (2d Cir. 2006); *Pohlot*, 827 F.2d at 890 (3d Cir.); *United States v. Worrell*, 313 F.3d 867, 874 (4th Cir. 2002); *Odeh*, 815 F.3d at 980 (6th Cir.); *United States v. Bartlett*, 856 F.2d 1071, 1077-82 (8th Cir. 1988); *United States v. Twine*, 853 F.2d 676, 679 & n.1 (9th Cir. 1988); *United States v. Brown*, 326 F.3d 1143, 1147 (10th Cir. 2003); *United States v. Litzky*, 18 F.4th 1296, 1303 (11th Cir. 2021).

insanity standard, IDRA made it an "affirmative defense" that, at the time of the offense, "the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts." 18 U.S.C. § 17(a). But IDRA makes clear that "[m]ental disease or defect does not otherwise constitute a defense." *Id.* Focusing on the term "defense" in 18 U.S.C. § 17(a), the federal circuits have held that mental-condition evidence is admissible when offered, not as a "defense," but to negate mens rea, an essential element of the prosecution's case.[20]

State and federal cases provide useful examples of when mental-condition testimony is admissible to negate mens rea, and when it should be excluded as inadequate. For instance, the Eleventh Circuit held that the district court properly excluded expert testimony that the defendant suffered a mental disorder causing him "increased anxiety and . . . a heightened need to protect himself"; the testimony failed to show that the defendant "did not know he was shooting at law-enforcement officers." *United States v. Bates*, 960 F.3d 1278, 1290 (11th Cir. 2020). Similarly, the Supreme Court of Washington held that although the defendant suffered from dissociative personality disorder, "more commonly known as multiple personality disorder," the expert failed to show how that disorder negated the defendant's intent to kidnap and rape his psychotherapist. *State v. Greene*, 984 P.2d 1024, 1026, 1029 (Wash. 1999).

Likewise, the Tenth Circuit held that the district court properly excluded a psychiatrist's testimony about the defendant's post-traumatic stress disorder and chemical dependency where it failed to negate mens rea. *United States v. Brown*, 326 F.3d 1143, 1145 (10th Cir. 2003). The

---

[20] *E.g.*, *Odeh*, 815 F.3d at 980 ("Notwithstanding the IDRA's restrictions on the use of mental defect evidence as a *defense*, evidence of a defendant's diminished mental capacity remains admissible to prove that the defendant could not form the required mens rea."); *Twine*, 853 F.2d at 679 ("Congress intended to restrict a defendant's ability to excuse guilt with mental defect evidence . . . . But Congress did not intend to eliminate a defendant's ability to disprove guilt with mental defect evidence.").

expert testified that the defendant "did not have the capacity to conform his conduct to the requirements of the law" and lacked the ability "to 'make the correct choices.'" *Id.* But that opinion did not go far enough, the court said, because the expert "did not opine on how [the defendant's] post-traumatic stress disorder, coupled with chemical dependency, was either related to or tended to negate the requisite specific intent element." *Id.* at 1148. The expert "fail[ed] to connect [the defendant's] mental condition with any legally acceptable theory that he lacked specific intent." *Id.*

In other words, to be "helpful" to the fact finder, "it is not enough that . . . a defendant may be diagnosed as suffering from a particular mental condition." *Greene*, 984 P.2d at 1029. "The diagnosis must . . . be capable of forensic application . . . to help the trier of fact assess the defendant's mental state at the time of the crime." *Id.*

For instance, Iowa's highest court found the expert's testimony admissible to negate mens rea because the expert explained how the defendant's delusional disorder made him think he was stabbing "an alien being from another planet," not a human. *State v. Diaz*, 507 P.3d 1109, 1112, 1116 (Iowa 2022). And the Seventh Circuit held that the trial court should have allowed the defendant's psychiatrist to testify that the defendant who brandished a gun at an FBI agent had a mental condition that made him want to harm himself, not threaten law-enforcement officers. *United States v. Staggs*, 553 F.2d 1073, 1074, 1076 (7th Cir. 1977).[21]

### 3. *The trial court properly excluded Dr. Boyd's testimony.*

With those background principles in mind, we find no error in the trial court's decision to exclude Dr. Boyd's testimony. When Dr. Boyd expressed her opinion about Shaw's mental condition, she typically described him as having impaired judgment or impaired reasoning. She

---

[21] *Staggs* was implicitly overruled in part on other grounds by *United States v. Woody*, 55 F.3d 1257 (7th Cir. 1995). *See United States v. Ricketts*, 146 F.3d 492, 497 (7th Cir. 1998).

said in her first opinion that she was unaware of "information showing that [Shaw] had an ongoing psychotic break during the relevant time period . . . . Instead, he had a historical pattern of becoming overwhelmed and thus functioning poorly in a crisis." She thought it "highly likely" that Shaw had become "overwhelmed and did not have the ability to independently determine what to do when he found his partner's body."

In one sentence of that letter, Dr. Boyd came close to saying that Shaw's mental condition prevented him from knowingly or intentionally concealing Fisher's body. But her analysis focused on the moment Shaw claims to have discovered Fisher's dead body in his apartment, rather than days later, on May 8, when Shaw falsely told Officer Williams that Fisher was not inside but at the hospital. Dr. Boyd wrote:

> [Shaw's] overall pattern of behavior around the time of the alleged offense . . . is more consistent with a disorganized and highly stressed person with Complex-PTSD, whose limited mental resources were overwhelmed by the shock and pain *of finding his partner dead*, than it is with planful, intentional, and instrumental concealment to avoid detection of the dead body.

(Emphasis added.)

Because "the admissibility of evidence is decided by the court," Va. R. Evid. 2:104(a), the trial judge here appropriately conducted a pretrial hearing to better understand Dr. Boyd's testimony and explore its admissibility. Dr. Boyd testified that Shaw's complex PTSD and severe major depressive disorder caused behavior that "was more reactive" and "more impulsive," with "very poor judgment" and "severe difficulty thinking through the potential consequences of his actions." Dr. Boyd acknowledged, however, that Shaw's impairment did not necessarily continue for the entire three days between Fisher's death and the discovery of his body by police. "[I]f it's a longer period of time than just a few seconds, the greater likelihood is that the transient stress related psychosis was not there the entire time, but rather was there sporadically at intervals when . . . under particularly severe stress." Indeed, "[b]ecause it's a

- 27 -

time limited condition, it wouldn't be likely that it would be present for more than say a few hours." It could "recur," however, "so it could happen for a few hours in the morning and then a few hours in the evening, a few hours on day one, and a few hours on day two. So the issue with that," she said, is that "it tends to flux."

Dr. Boyd struggled when asked directly whether Shaw was experiencing that impairment throughout the three days that Fisher's body remained in his apartment. She said that "[t]he difficulty here is that the time of the offense is somewhat vague in terms of actual timing." There were "times that he could engage in some amount of planning and intentional behavior and other times when he would have been under acute stress and less able to do that and, therefore, that is described as impulsive and reactive." Yet when pressed by the trial court, Dr. Boyd was uncertain. The court asked: "So can you say that there were times during the three-day period where he had the ability to plan and act intentionally?" She answered, after a pause noted by the court reporter, "I would say it's possible given the flux in his symptoms more than . . . I can say that it's affirmatively true."

After that pretrial hearing, Shaw tendered a declaration from Dr. Boyd supplementing her testimony, but again, she focused on Shaw's impaired judgment and reasoning; she did not explain how Shaw's mental condition showed that he was not knowingly hiding Fisher's body from the police. She said, for instance, that "Shaw's symptoms impaired his ability to process the information about death in a reality-based way, to reason about his circumstances, and to independently formulate and execute organized planning." His "behaviors and responses during the roughly three-day period . . . are best characterized as reactive, impulsive, and instinctive, rather than planful." That is, he "engaged in unconsidered, impulsive behavior that was focused on the immediate moment rather than days or weeks ahead."

Missing from Dr. Boyd's many sworn statements was an explanation connecting Shaw's mental condition to *how* it negated the state of mind required to violate Code § 18.2-323.02. For example, when Shaw stood in front of his apartment on May 8, afraid of having his probation revoked, and told Officer Williams that Fisher was not inside but at the hospital and that Shaw was about to visit him there, how was that *not* a knowing falsehood? And how did Shaw *not* intend that deception "to prevent the detection of the death or the manner or cause of death"? Code § 18.2-323.02. Dr. Boyd's testimony resembles that of other experts that courts have deemed inadmissible to negate mens rea: general psychiatric testimony that "may easily slide into wider usage that opens up the jury to theories of defenses more akin to justification." *United States v. Westcott*, 83 F.3d 1354, 1358 (11th Cir. 1996) (quoting *United States v. Cameron*, 907 F.2d 1051, 1067 (11th Cir. 1990)). In other words, "only psychiatric evidence [that] supports a '*legally acceptable* theory of lack of *mens rea*' should be admitted." *Id.* (quoting *Cameron*, 907 F.2d at 1067).

The abuse-of-discretion standard appropriately governs our review of the trial court's admissibility decision because it is often hard to determine *when* the evidence of impaired mental condition goes far enough to show that the defendant did not have the requisite intent to commit the crime. "We often act intending to accomplish the immediate goal of our activity, while not fully appreciating the consequences of our acts. But purposeful activity is all the law requires." *United States v. Pohlot*, 827 F.2d 889, 907 (3d Cir. 1987). "Psychiatrists are capable of supplying elastic descriptions of mental states that appear to but do not truly negate the legal requirements of mens rea." *Id.* at 890. "Presenting defense theories or psychiatric testimony to juries that do not truly negate mens rea may cause confusion about what the law requires." *Id.*

In evaluating the competing considerations surrounding admissibility—"relevance, confusion, reliability, helpfulness—the [trial] court has a comparative advantage over an appeals

panel. The issues typically involve unique fact patterns and judgments of degree, and the [trial] judge is closer to the case." *United States v. Schneider*, 111 F.3d 197, 201 (1st Cir. 1997). "Thus, so long as there is no misstatement of the legal standard and the result reached is not clearly unreasonable," appellate courts should usually respect the trial court's admissibility ruling. *Id.*

We find that appellate guidance appropriate here, as the trial court did not misstate the law nor adopt a "clearly unreasonable" evaluation of Dr. Boyd's testimony. Taking its "gatekeeper function" seriously, the court conducted a pretrial evidentiary hearing to understand and evaluate Dr. Boyd's opinions. *Shaw*, 109 Va. Cir. at 356. The court excluded Dr. Boyd's testimony after determining that she failed to apply her description of Shaw's "mental illness to the distinct, separate statutory intent elements." *Id.* at 359. The court found it "unclear whether Dr. Boyd's opinion [went] to the malicious intent requirement or the body concealment *mens rea* requirements of . . . Code § 18.2-323.02, or the time period." *Id.* at 362. Given those "separate missing variables," the jury would have "to speculate [about] which of Shaw's numerous mental health symptoms impaired the differing intent requirements and whether they did so in a manner significant enough to negate both intent requirements under the statute." *Id. See* Va. R. Evid. 2:702(b) ("Testimony that is speculative . . . is not admissible."). We find no abuse of discretion in that reasoning.

We likewise reject Shaw's claim (Assignment of Error 5) that the "Commonwealth opened the door" to admitting Dr. Boyd's testimony "by introducing evidence of [Shaw's] mental illness."

> "[O]nce a party has 'opened the door' to inquiry into a subject, the
> permissible scope of examination on the subject by the opposing
> party is 'a matter for the exercise of discretion by the trial court,'
> and we will not disturb the court's action on appeal unless it
> plainly appears that the court abused its discretion."

*Commonwealth v. Swann*, 290 Va. 194, 199 (2015) (per curiam) (quoting *Savino v. Commonwealth*, 239 Va. 534, 545 (1990)).  Shaw stated about an hour into his videotaped interview that "I suffer from PTSD, . . . anxiety, and I . . . get depressed a lot."  Even crediting the premise that the Commonwealth opened the door to more information about those mental conditions, the Commonwealth "did not open the door as wide" as Shaw claims.  *Swann*, 290 Va. at 199.  We cannot find that the trial court abused its discretion by continuing to exclude Dr. Boyd's testimony after concluding that Boyd failed to show how Shaw's mental condition negated either of the two statutory state-of-mind requirements.

  C.  *The trial court did not err in denying Shaw's pretrial motions*.

  We also find no error in the trial court's rulings denying Shaw's motion for a bill of particulars or his motion *in limine*.

   *1.  The trial court did not abuse its discretion by denying a bill of particulars (Assignment of Error 8).*

  Shaw argues that a bill of particulars was needed to understand four aspects of the Commonwealth's case.  Shaw Br. 39.  In the hearing on his motion in the trial court, however, Shaw narrowed his request to "what the unlawful act is or what the manner . . . and cause of death were [that] the Commonwealth believes that Mr. Shaw wanted to conceal or prevent the detection of.  That's it.  We can stop right there."  Because Shaw narrowed his argument in the trial court, only those claims are preserved for appeal.  *See* Rule 5A:18.

  "A court of record *may* direct the filing of a bill of particulars at any time before trial."  Code § 19.2-230 (emphasis added).  "The trial court's decision whether to require the Commonwealth to file a bill of particulars is a matter that rests within its sound discretion."  *Swisher v. Commonwealth*, 256 Va. 471, 480 (1998); *Rams v. Commonwealth*, 70 Va. App. 12, 41 (2019) (same).  Generally, "where the indictment 'give[s] the accused "notice of the nature and character of the offense charged so he can make his defense[,]" a bill of particulars is not

required.'" *Rams*, 70 Va. App. at 42 (alterations in original) (quoting *Strickler v. Commonwealth*, 241 Va. 482, 490 (1991)). "As long as an indictment sufficiently recites the elements of the offense, the Commonwealth is not required to include all evidence upon which it plans to rely to prove a particular offense." *Sims v. Commonwealth*, 28 Va. App. 611, 619-20 (1998).

The indictment here satisfied that standard. Tracking the language of Code § 18.2-323.02, the indictment alleged that Shaw, "[o]n or about May 8, 2020 in the County of Arlington, did transport, secrete, conceal or alter a dead body, as defined in § 32.1-249, with malicious intent and to prevent detection of an unlawful act or to prevent the detection of the death or the manner or cause of death." Shaw was not entitled to a bill of particulars requiring the Commonwealth to identify the evidence it planned to adduce in support of each element of that offense. *E.g.*, *Juniper v. Commonwealth*, 271 Va. 362, 389 (2006) (capital defendant not entitled to bill of particulars disclosing "the theory [the Commonwealth] intended to rely upon to prove the 'vileness' factor at sentencing"); *Rams*, 70 Va. App. at 40-41 (defendant not entitled to "bill of particulars regarding the Commonwealth's theory of the *corpus delicti*").

Nor are we persuaded by Shaw's argument that the trial court had to order a bill of particulars under Code § 19.2-266.2. That statute requires a defendant to raise before trial motions to suppress evidence or dismiss charges based on the United States Constitution or the Virginia Constitution. "To assist the defense in filing such motions or objections in a timely manner, the circuit court shall, upon motion of the defendant, direct the Commonwealth to file a bill of particulars . . . ." Code § 19.2-266.2(C). But that statute did not entitle Shaw to a bill of particulars because he has not identified any such constitutional argument that he wanted to make or was precluded from making. *See Goins v. Commonwealth*, 251 Va. 442, 454-55 (1996) (finding no abuse of discretion in denying bill of particulars when "the record fails to show that

- 32 -

the denial . . . impaired [the defendant's] ability to challenge the application of the capital murder and death penalty statutes, or to file suppression motions based on Fourth and Fifth Amendment grounds").

> ### 2. *The trial court did not err in denying Shaw's motion in limine* (*Assignment of Error 9*).

We review the trial court's rulings to admit or exclude evidence for an abuse of discretion. *Blankenship*, 69 Va. App. at 697. "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Id.* (quoting *Tynes v. Commonwealth*, 49 Va. App. 17, 21 (2006)).

Before trial, Shaw moved *in limine* for an order "precluding the Commonwealth from introducing any evidence of unlawful acts, manner or cause of death, and other adjudicated or unadjudicated criminal acts." Shaw's written motion did not list the prior bad acts he sought to exclude. Shaw's counsel acknowledged at the pretrial hearing:

> I don't know whether the Commonwealth intends to use any of
> this, these incidents, but there are a whole bunch of incidents. And
> I didn't add a lot of clarity on the motion, but kind of on purpose.

Defense counsel mentioned a few items, however, including a February 23, 2020 "domestic call" and alleged assaults on March 12 and March 20. He also asked the court to exclude the fact that Shaw had "a prior criminal record."

The Commonwealth responded that it would redact from the videotaped police interview Shaw's mention of his "coming back from prison." But the Commonwealth defended as relevant any assaults by Nduku, Fisher, or Shaw. The Commonwealth argued that those facts would be relevant to Shaw's motive for hiding Fisher's body to prevent the discovery of an "unlawful act." The trial court denied Shaw's motion.

Although Shaw claims here that the trial court erred by denying his motion *in limine*, his brief devotes less than one page of argument to the particular prior bad acts he says should have been excluded. We can glean only two from his abbreviated discussion.

First, he objects in a single sentence to the introduction of "some statements detailing *a prior fight between Shaw and Fisher*," Shaw Br. 42-43 (emphasis added), but we cannot tell which fight he means. The brief does not identify the time stamps in the hour-and-a-half long video. Reviewing the video ourselves, we noted three times that Shaw referenced quarreling with Fisher. Shaw mentioned: "one time" that he "slapped" Fisher, after which Fisher "grabbed" him and they "bear-hugged"; a "major fight" in April where Shaw wanted to "kick [Fisher] out of the house"; and an "argument" between them, on the Sunday before Fisher died, because Fisher ate breakfast at McDonald's even though Shaw had purchased groceries and stocked the refrigerator with food. We treat Shaw's failure to specify *which* "fight" should have been excluded as a forfeiture of the argument. *See Coward v. Wellmont Health Sys.*, 295 Va. 351, 367 (2018) ("[I]t is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." (quoting *Bartley v. Commonwealth*, 67 Va. App. 740, 746 (2017))).

Second, Shaw argues that the trial court erred by admitting "statements . . . in Shaw's interrogation video that constituted evidence" of "Shaw's prior criminal record" and "return from prison." Shaw Br. 42. The Commonwealth responds, however, that the prosecution *did* redact from the videotaped interview Shaw's statement that "I just got out." Shaw does not dispute that point in his reply brief.

In any event, Shaw overlooks that evidence of the same character was admitted at trial, thereby forfeiting the objection. "It is a well settled and obviously sound general rule that an

objection to evidence cannot be availed of by a party who has, at some other time during the trial, . . . *permitted it to be brought out by his adversary without objection.*" *Burns v. Bd. of Supervisors*, 227 Va. 354, 363 (1984) (emphasis altered) (quoting *Whitten v. McClelland*, 137 Va. 726, 741 (1923)). "This same-evidence principle has . . . stood in roughly the same form for well over a century," and it "applies to criminal and civil cases." *Isaac v. Commonwealth*, 58 Va. App. 255, 260 (2011).[22]

> Though explained in different ways, the practical effect of the principle remains clear: "Some courts so hold because the error is harmless, and others because the subsequent introduction of the same evidence is a waiver of the objection. Whether it be placed upon one ground or the other, the result is the same."

*Id.* at 260-61 (quoting *N.Y. Life Ins. Co. v. Taliaferro*, 95 Va. 522, 523 (1898)).

Shaw's text message to his mother, part of the Commonwealth's Exhibit 57, included Shaw's statement that he was "most worried about" the fact he was on "probation[.] [I] have 10 years back up time." The trial court overruled Shaw's objection to that statement coming into evidence, finding that Shaw's fear of having his probation revoked was probative of his "motive" to conceal Fisher's body.

Because Shaw has not assigned error to that ruling, however, he cannot complain about any alleged reference in the videotaped interview to his prison time. The "scope" of the forfeiture under the same-evidence principle is broad. It includes "evidence dealing 'with the same subject,'" *Isaac*, 58 Va. App. at 264 (quoting *Pettus v. Gottfried*, 269 Va. 69, 79 (2005)), "evidence fairly considered to be 'of the same character,'" *id.* (quoting *Combs v. Norfolk & W. Ry. Co.*, 256 Va. 490, 499 (1998)), "as well as evidence 'similar to that to which the objection

---

[22] The same-evidence principle also applies when a party "has, at some other time during the trial, voluntarily elicited the same evidence," *Burns*, 227 Va. at 363 (quoting *Whitten*, 137 Va. at 741), but an exception applies there "for evidence elicited 'during cross-examination of a witness or in rebuttal testimony,'" *Isaac*, 58 Va. App. at 261 (quoting *Zektaw v. Commonwealth*, 278 Va. 127, 134 (2009)).

applies,'" *id.* (quoting *Snead v. Commonwealth*, 138 Va. 787, 802 (1924)).  Shaw's text message about his fear of having his probation revoked and ten years' back-up time reimposed is of the same character and same subject as his having previously served time in prison.

CONCLUSION

Having carefully reviewed Shaw's ten assignments of error, we find no reversible error in the judgment below.

*Affirmed*.